Opposers–Appellants: COLORADO WA-
TER CONSERVATION BOARD; and
State Engineer and Division Engineer
for Water Division No.4,

v.

Applicant–Appellee: UPPER GUNNISON
RIVER WATER CONSERVANCY
DISTRICT,

Opposers–Appellees: Virgil and Lee Spann
Ranches; Robert and Geraldine How-
ard; the City of Gunnison; Uncom-
pahgre Valley Water Users Association;
Colorado River Water Conservation Dis-
trict; Trout Unlimited; Gerald E. Bull-
ock; Thomas C. Kelley; Brenda M. Kel-
ley; Roy B. Winslow Helen Winslow;
Paula J. Lehr; William F. Chambliss;
Linda Chambliss; Kenneth R. Bergan;
Mary T. Bergan; Ben Peterson; Jill Pe-
terson; Karl R. Peterson; Ruth S. Pe-
terson; Nancy Ruehle; Raymond L.
Ruehle; Arthur I. Means; Toni M. Bull-
ock; Linda M. Goldman; Mike Peter-
son; Carl Long; Ruth Marie Long; J.
Craig Bryant; and Lu Ann Bryant.

No. 04SA44.

Supreme Court of Colorado.

March 14, 2005.

John W. Suthers Attorney General, Susan J. Schneider, Assistant Attorney General, Lori J. Coulter, Assistant Attorney General, Patrick E. Kowaleski, First Assistant Attorney General Water Rights Unit, Natural Resources and Environment Section, Denver, for Opposers–Appellants, Colorado Water Conservation Board; and State Engineer and Division Engineer for Water Division No. 4.

Alperstein & Covell PC, Cynthia F. Covell, Gilbert Y. Marchand, Andrea L. Benson, Denver, for Applicant–Appellee, Upper Gunnison River Water Conservancy District.

Moses, Wittemyer, Harrision and Woodruff, P.C., Timothy J. Beaton, Gabriel D. Carter, Boulder, for Opposer–Appellee the City of Gunnison.

Peter C. Fleming, Jill C.H. McConaughy, Kirstin E. McMillan–Gillespie, Glenwood Springs, for Opposer–Appellee Colorado River Water Conservation District.

Andrew Peternell, Boulder, for Opposer–Appellee Trout Unlimited.

Hill & Robbins, P.C., David W. Robbins, Dennis M. Montgomery, Jennifer H. Hunt, Denver, for Amicus Curiae the Rio Grande Water Conservation District and Southwestern Water Conservation District.

Maynes, Bradford, Shipps & Sheftel, Frank E. (Sam) Maynes, John Barlow Spear, Durango, for Amicus Curiae Southwestern Water Conservation District.

Patricia L. Wells, Michael L. Walker, Casey S. Funk, Denver, for Amicus Curiae the City and County of Denver Acting by through its Board of Water Commissioners.

Burns, Figa & Will P.C., Lee Miller, Englewood, for Amicus Curiae Southeastern Colorado Water Conservancy District and the Colorado Farm Bureau.

Weiss & Van Scoyk LLP, Robert G. Weiss, Steamboat Springs, for Amicus Curiae Upper Yampa Water Conservancy District, the Town of Oak Creek, and the Town of Yampa.

Duncan Ostrander & Dingess, P.C., John M. Dingess, Denver, for Amicus Curiae the City of Aurora, Colorado acting by and through its Utility Enterprises.

Porzak Browning & Bushong, LLP, Glenn E. Porzak, P. Fritz Holleman, Boulder, for Amicus Curiae for the City of Steamboat Springs, the City of Golden, the Town of Vail, the Town of Breckenridge, Vail Resorts, Inc., the Eagle River Water & Sanitation District, the Upper Eagle Regional Water Authority, and the Colorado White Water Association.

Holland & Hart, LLP, Anne J. Castle, Christopher L. Thorne, Denver, for Amicus Curiae the City of Pueblo and the Town of Minturn.

Sullivan Green Seavy, LLC, Barbara Green, Boulder, Taylor C. Hawes, Silverthorne, for Amicus Curiae Northwest Colorado Council of Governments.

John M. Ely, Aspen, for Amicus Curiae Pitkin County.

David Baumgarten, Thomas A. Dill, Gunnison, for Amicus Curiae Gunnison County.

Anthony J. DiCola, Hot Sulphur Springs, for Amicus Curiae Grand County.

No appearance by or on behalf of: Virgil and Lee Spann Ranches; Robert and Geraldine Howard; Uncompahgre Valley Water Users Association; Gerald E. Bullock; Thomas C. Kelley; Brenda M. Kelley; Roy B. Winslow; Helen Winslow; Paula J. Lehr; William F. Chambliss; Linda Chambliss; Kenneth R. Bergan; Mary T. Bergan; Ben Peterson; Jill Peterson; Karl R. Peterson; Ruth S. Peterson; Nancy Ruehle; Raymond L. Ruehle; Arthur I. Means; Toni M. Bullock; Linda M. Goldman; Mike Peterson; Carl Long; Ruth Marie Long; J. Craig Bryant; and Lu Ann Bryant.

RICE, Justice.

Appellants the Colorado Water Conservation Board (CWCB or "the Board") and the State and Division No. 4 Engineers appeal the water court's order and decree granting a recreational in-channel diversion (RICD) conditional water right to Applicant Upper Gunnison River Water Conservancy District. We reverse.

Upon review, we hold that both the CWCB and the water court erred. In Senate Bill 01–216 (SB 216 or "the bill"), Ch. 305, 2001 Colo. Sess. Laws 1187 (codified at §§ 37–92–102(5), (6), 37–92–103(4), (7), (10.3), 37–92–305(13)–(16), C.R.S. (2004)), the General Assembly established a procedure for the adjudication of instream diversions by local government entities for recreational uses. The CWCB was granted initial, limited fact-finding authority on enumerated factors as applied strictly to an applicant's claimed stream flow and intended recreation experience. By considering stream flow amounts and recreation experiences other than those intended by Applicant, the CWCB exceeded this authority.

SB 216 charged the water court, in contrast, with adjudication of a RICD application, requiring it to consider five statutory factors—compact impairment, stream reach appropriateness, access availability, instream flow rights injury, and maximum utilization—and treat the CWCB's factual findings on these same factors presumptively. Should any party produce evidence contrary to the CWCB's findings, the presumption is rebutted, and the water court must weigh the

evidence before it under a preponderance of the evidence standard.

In addition, the water court must determine whether a RICD application is limited to the minimum stream flow necessary for an objectively reasonable recreation experience in and on the water because any appropriation in excess of the minimum stream flow for a reasonable recreation experience in and on the water does not put water to beneficial use. Since it did not consider whether Applicant's intended in-channel recreational diversion was in fact a RICD as defined by SB 216, the water court erred when it awarded Applicant a decree in the claimed stream flow amounts.

## I.  Facts and Procedural History

This case concerns the first RICD decreed as a conditional water right under SB 216, which the General Assembly enacted in 2001. Applicant is constructing a whitewater course along the Gunnison River near the town of Gunnison. The course has been designed to be "conducive to many types of whitewater boating for a variety of different skill levels," as Applicant hopes to draw both locals and tourists, host competitions, enhance Western State College's outdoor recreation program, and strengthen the region's overall economy. Seeking to acquire decreed water rights for the course's stream flow requirements, Applicant filed an application for a RICD in March 2002.

In its RICD filing, Applicant claimed variable, daytime stream flows ranging from 270 to 1500 cubic feet per second (cfs).[1] These variable flows totaled approximately 157,000 acre feet annually—over 41 percent of the Gunnison River's available stream flow. Applicant claimed the highest flows only during the last two weeks of June and the first two weeks of July, when water supplies were ample. The course was designed with diversion structures incorporating both low flow and high flow channels in order to maximize use of the whitewater course by all skill levels throughout the recreational boating season, even as stream flows decreased. Applicant claimed no water for the months October through April.

The CWCB reviewed Applicant's claimed RICD, accepting both oral and written comments from Applicant and other interested parties. Following deliberations, the CWCB issued written findings and recommendations to the water court. The CWCB did not evaluate the application strictly as submitted by Applicant, but rather found that "the RICD stream flow will create whitewater features sufficient to attract experienced whitewater kayakers and therefore will be for the minimum stream flow necessary to provide a reasonable recreation experience in and on the water if those stream flow amounts are as follows: 250 cfs during May through September, and 0 cfs during the rest of the year."

Applicant then proceeded to the water court for adjudication. After hearing testimony and reviewing the CWCB's findings and conditional recommendation, the water court issued a decree awarding a RICD in the higher flow amounts Applicant claimed and not the 250 cfs recommended by the CWCB. In doing so, the water court acknowledged that Applicant's was "the first application to be addressed under" SB 216. Therefore, the water court began its analysis by examining the language of the statute, leading it to conclude that it was to treat the CWCB's findings of fact as a rebuttable presumption. The water court then addressed what it determined to be the "primary issue"—"whether Applicant has overcome the rebuttable presumption that 250 cfs for the entire rafting season is the appropriate quantity of water for its proposed whitewater park recreational use." As the water court explained, "once [the] CWCB concluded that 250 cfs for the entire rafting season was appropriate, Applicant had the burden of going forward to demonstrate why any greater

1.

| May 1-15 | May 16-31 | June 1-15 | June 16-30 | July 1-15 | July 16-31 | Aug. 1-15 | Aug. 16-31 | Sept. 1-15 | Sept. 16-30 |
|---|---|---|---|---|---|---|---|---|---|
| 570 | 1190 | 1460 | 1500 | 1100 | 530 | 460 | 390 | 300 | 270 |

amount is appropriate." "Based on the totality of the evidence presented," the water court concluded "that Applicant ha[d] met its burden of proof to overcome the rebuttable presumption."

Upon concluding that Applicant was entitled to more than 250 cfs, the water court then faced another issue—whether the CWCB had made any findings regarding stream flow amounts above 250 cfs that it should treat as presumptively valid. The water court noted that the "CWCB does not find that the amounts applied for either do or do not comport with the [statutory] factors," and it "does not find that 250 cfs is the maximum quantity which could comport with the [statutory] factors." Although the water court entertained "the possibility that there [are] at least ... implicit findings" regarding 250 cfs being the maximum flow, the water court concluded that the CWCB made no presumptively valid findings concerning stream flows above 250 cfs.

The water court then attempted to determine the meaning of the phrase " 'minimum' stream flow for a reasonable recreational experience as utilized in the statute." The water court concluded that the "language must be read in context with all of the other provisions." Emphasizing that "[u]nder traditional water law principles, maximum utilization and beneficial use are balanced against speculation and waste," the water court explained that "[h]ad the legislature intended to deviate from that balance in Senate Bill 216, they would have said so." For these reasons, the water court was "reluctant to intervene to usurp Applicant's determination of the size and scope of a RICD, subject to the traditional criteria of speculation and waste." Examining Applicant's requested stream flows, the water court found "that the amount sought in this instance does not reach the level of speculation or waste."

The water court finally analyzed Applicant's requested stream flows under the statutory factors—compact impairment, stream reach appropriateness, access availability, instream flow rights injury, and maximum utilization—having concluded that the CWCB did not make any presumptively valid findings regarding these factors as applied to flow amounts above 250 cfs. Concluding that Applicant's requested stream flows were appropriate under the statutory factors, the water court granted Applicant conditional water rights in a decree awarding the claimed amounts in full and setting the date of priority as October 20, 1998.

Appellants exercised their right to appeal and now ask this Court to reverse on multiple grounds. First, Appellants argue that all presumptively valid CWCB findings must be upheld by the water court unless rebutted by clear and convincing evidence. As a part of this argument, Appellants argue that SB 216 grants the CWCB the authority to determine whether the claimed amount is the minimum stream flow required for a reasonable recreation experience and that its determination of that amount is also presumptive. Second, Appellants contend that the water court erred in failing to limit Applicant's requested RICD to the "minimum stream flow" as required under SB 216.

In so arguing, Appellants require us to construe SB 216 in a manner that illuminates the dividing line between the CWCB and the water court in RICD adjudications. Thus, we must determine precisely how the General Assembly intended to define the respective roles of the CWCB and the water court—specifically, whether the CWCB has the authority to determine the "minimum stream flow" "for a reasonable recreation experience in and on the water" or whether that consideration is left exclusively to the water court. As a corollary, we also must determine precisely what authority the bill grants the CWCB, and what evidentiary weight the water court must give to the Board's authorized findings. Moreover, we must discern the General Assembly's intent regarding the statutory definition of a RICD. Specifically, is the water court limited in decreeing a RICD for only the minimum stream flow necessary for a reasonable recreation experience in and on the water?

## II. Legal Background

Prior to the case now before us, we have not had occasion to construe SB 216. Before we consider Appellants' arguments, a brief review of Colorado law prior to the General

Assembly's enactment of SB 216 as well as an overview of the bill itself is instructive.

## A. Recreational Diversions before SB 216

Over ten years ago, we concluded that the "plain language" of the statutory definitions of "diversion" and "beneficial use" then in effect allowed the appropriation of water "by a structure or device which either removes water away from its natural course or location and towards another course or location or which controls water within its natural watercourse." *City of Thornton v. City of Fort Collins,* 830 P.2d 915, 930–31 (Colo. 1992) (referring to § 37–92–103(4), (7), 15 C.R.S. (1990)). Of course, the appropriated water must be put to a beneficial use, though "[t]he type of beneficial use to which the controlled water is put may mean that the water must remain in its natural course." *Id.* at 931. The applicant in *Fort Collins,* we held, either removed or controlled the water and put it to valid beneficial uses—"recreational, piscatorial and wildlife uses, all valid under the [statute]." *Id.* (referring to § 37–92–103(4)).

The implications of our holding in *Fort Collins* have been the subject of considerable debate and disagreement both in the General Assembly, *see infra* Parts III.A., III.B.2., and on this Court. For example, after *Fort Collins,* the communities of Breckenridge and Golden filed applications seeking decrees for in-channel flow rights to operate white-water kayak courses. Before the water courts ultimately granted the respective conditional decrees, the General Assembly enacted SB 216. Since the amendments were not retroactive, §§ 37–92–102(6)(e), 37–32–103(7), 37–92–305(16), C.R.S. (2004), the water courts did not apply them to Breckenridge and Golden's applications. Although these cases were appealed, this Court was equally divided, thereby affirming the decrees by operation of law. *State Eng'r v. City of Golden,* 69 P.3d 1027, 1028 (2003); *State Eng'r v. Eagle River Water & Sanitation Dist.,* 69 P.3d 1028, 1029 (Colo.2003).

## B. An Overview of SB 216

▮ "Absent constitutional concerns, the General Assembly may amend or repeal pri-or legislation as the result of the adoption of policies that differ from those previously embraced by that governmental institution." *People v. Juvenile Court, City & County of Denver,* 893 P.2d 81, 89 (Colo.1995). Exercising this authority, SB 216 amended the Water Right Determination and Administration Act of 1969, sections 37–92–101 to –602, C.R.S. (2004), in several important respects.

First, the bill affected changes in statutory definitions. "Diversion" and "beneficial use" were amended to expressly encompass recreational in-channel diversions:

> "Diversion" or "divert" means removing water from its natural course or location, or controlling water in its natural course or location, by means of a ditch, canal, flume, reservoir, bypass, pipeline, conduit, well, pump, or other structure or device; except that only a county, municipality, city and county, water district, water and sanitation district, water conservation district, or water conservancy district may control water in its natural course or location for recreational in-channel diversions. This does not apply to applications filed prior to January 1, 2001.
>
> . . .
>
> "Beneficial use" is the use of that amount of water that is reasonable and appropriate under reasonably efficient practices to accomplish without waste the purpose for which the appropriation is lawfully made and, without limiting the generality of the foregoing, includes the impoundment of water for recreational purposes, including fishery or wildlife, and also includes the diversion of water by a county, municipality, city and county, water district, water and sanitation district, water conservation district, or water conservancy district for recreational in-channel diversion purposes . . . .

§ 37–92–103(4), (7). This referenced term, "RICD," was defined as follows:

> "Recreational in-channel diversion" means the minimum stream flow as it is diverted, captured, controlled, and placed to beneficial use between specific points defined by physical control structures pursuant to an

application filed by a county, municipality, city and county, water district, water and sanitation district, water conservation district, or water conservancy district for a reasonable recreation experience in and on the water.

§ 37–92–103(10.3).

In addition, as will be discussed in greater detail below, the bill outlined a review and adjudication procedure for RICD applications. After filing an application with the water court, a RICD applicant must submit a copy to the CWCB for review that involves initial, limited fact-finding on enumerated factors and a resulting recommendation. A RICD applicant then proceeds from the CWCB to the water court for judicial adjudication. The water court must consider the CWCB's recommendation and examine an applicant's claimed flows under the statutory factors previously applied by the CWCB, but the agency's findings on these same factors are presumptively valid, subject to rebuttal by any party.

### III. Analysis

#### A. The Colorado Water Conservation Board's Role

As clearly set forth in the title of SB 216,[2] the General Assembly established a procedure by which recreational in-channel diversions are to be adjudicated. The procedure starts with the CWCB, and thus, we begin our inquiry there as well.

According to the plain language of SB 216 as codified, a RICD applicant must "submit a copy of the water rights application to the [B]oard for review" before appearing at the water court for adjudication. § 37–92–102(5). Upon receiving the application, the CWCB must review it and make certain findings. Specifically, SB 216 requires the CWCB to "consider" five enumerated areas of inquiry "and make written findings thereon":

(I) Whether the adjudication and administration of the recreational in-channel diversion would impair the ability of Colorado to fully develop and place to consumptive beneficial use its compact entitlements;

(II) The appropriate reach of stream required for the intended use;

(III) Whether there is access for recreational in-channel use;

(IV) Whether exercise of the recreational in-channel diversion would cause material injury to instream flow water rights appropriated pursuant to subsections (3) and (4) of this section;

(V) Whether adjudication and administration of the recreational in-channel diversion would promote maximum utilization of waters of the state as referenced in paragraph (a) of subsection (1) of this section . . . .[3]

§ 37–92–102(6)(b)(I)–(V). Considering these factors and its written factual findings, the CWCB then must determine what recommendation it will make to the water court concerning the RICD application. § 37–92–102(6)(b). And, "[f]ollowing a public hearing, if requested by any party, the [B]oard shall make . . . a final recommendation as to whether the application should be granted, granted with conditions, or denied." § 37–92–102(6)(a).

Once the CWCB has completed its review, the application is returned to the water court, along with the factual findings and final recommendation of the CWCB, for adjudication: "[w]ithin ninety days after the filing of statements of opposition, the [B]oard shall report its findings to the water court for review pursuant to section 37–92–305(13). The [B]oard may defend such findings through participation in the water court proceedings." § 37–92–102(6)(c).

---

2. The title of the bill is "An Act Concerning the Establishment of a Procedure for the Adjudication of a Recreational In-Channel Diversion by a Local Government, and Making an Appropriation Therefor." Ch. 305, 2001 Colo. Sess. Laws 1187, 1187.

3. The CWCB also must consider "[s]uch other factors as may be determined appropriate for evaluation of recreational in-channel diversions and set forth in rules adopted by the board, after public notice and comment." § 37–92–102(6)(b)(VI). No additional factors have been set forth in rules adopted by the CWCB pursuant to this provision. As a result, we refer inclusively to the statutory factors as the "five" factors throughout this opinion.

■ The above seemingly simple procedure gives rise to the first issue presented for our review—namely, what is the extent of the review performed by the CWCB prior to the water court's adjudication? The CWCB, through Appellants, argues that the General Assembly granted it expansive authority, in particular, the authority to objectively determine what stream flow is minimally necessary in order to provide a reasonable recreation experience. Applicant, on the other hand, believes that the CWCB's authority is limited to a review of the application strictly as submitted by the applicant for appropriateness under the five statutory factors; that is, the CWCB only may examine the applicant's own determination of the amount of water it intends to appropriate for its proposed recreation experience.

After a careful analysis of the plain language of SB 216 as a whole, as well as noting the legislative history, we hold that the General Assembly intended for the CWCB to analyze the application purely as submitted by the applicant, rather than to objectively determine what recreation experience would be reasonable, and what minimum stream flow would meet that recreational need. As such, we hold that the General Assembly intended for the CWCB to function as a narrowly constrained fact-finding and advisory body when it reviews RICD applications, rather than in an unrestricted adjudicatory role.

■ Conclusions of law such as interpretations of statutes are always reviewed de novo. *E.g., Colorado Dept. of Labor & Employment v. Esser*, 30 P.3d 189, 194 (Colo. 2001). In construing statutes, our primary duty is to give full effect to the intent of the General Assembly. *E.g., Vigil v. Franklin*, 103 P.3d 322, 327 (Colo.2004). Accordingly, we start with the plain language of the statute, *e.g., In re 2000–2001 Dist. Grand Jury in and for First Judicial Dist.*, 97 P.3d 921, 924 (Colo.2004), because " 'if courts can give effect to the ordinary meaning of the words adopted by a legislative body, the statute should be construed as written since it may be presumed that the General Assembly meant what it clearly said,' " *Pierson v. Black Canyon Aggregates, Inc.*, 48 P.3d 1215,

1218–19 (Colo.2002) (quoting *Resolution Trust Corp. v. Heiserman*, 898 P.2d 1049, 1054 (Colo.1995)); *see also Scoggins v. Unigard Ins. Co.*, 869 P.2d 202, 205 (Colo.1994) (" 'We will not judicially legislate by reading a statute to accomplish something the plain language does not suggest, warrant or mandate.' ") (quoted in *Slack v. Farmers Ins. Exch.*, 5 P.3d 280, 284 (Colo.2000)).

■ Additionally, "[a] statutory interpretation leading to an illogical or absurd result will not be followed," *Frazier v. People*, 90 P.3d 807, 811 (Colo.2004) (citing *State v. Nieto*, 993 P.2d 493, 501 (Colo.2000)), and we strive to construe a "statute as a whole in order to give 'consistent, harmonious and sensible effect to all of its parts,' " *Bd. of County Comm'rs, Costilla County v. Costilla County Conservancy Dist.*, 88 P.3d 1188, 1192 (Colo.2004) (quoting *People v. Luther*, 58 P.3d 1013, 1015 (Colo.2002)); *see also Mountain City Meat Co. v. Oqueda*, 919 P.2d 246, 253 (Colo.1996) (" 'If separate clauses in the same statutory scheme may be harmonized by one construction, but would be antagonistic under a different construction, we should adopt that construction which results in harmony.' ") (quoted in *Farmers Ins. Exch. v. Bill Boom Inc.*, 961 P.2d 465, 470 (Colo.1998)).

Turning first to the plain language of section 37–92–102 as codified from SB 216, *see, e.g., In re 2000–2001 Dist. Grand Jury*, 97 P.3d at 924, it is clear that the CWCB must review a RICD application, including the plans put forth and the proposed use of the water right, strictly as submitted by the applicant. First, section 37–92–102(6)(a) directs the CWCB to make findings of fact and a final recommendation with respect to "the application." Next, section 37–92–102(6)(b) requires the CWCB to evaluate the five statutory factors with respect to "such application." Thus, the CWCB is limited to review of an application on its face; nothing in either statutory provision allows the CWCB to look beyond the stream flow claimed or the recreation experience intended by an applicant when reviewing a RICD application. *See, e.g., Pierson*, 48 P.3d at 1218–19; *see Scoggins*, 869 P.2d at 205.

Even the CWCB's own rules, expressly adopted pursuant to section 37–92–102(6)(b)(VI) establish that the Board must evaluate an application only as proposed by an applicant. Specifically, the CWCB's rules define the phrase "reasonable recreation experience" as "[a]n experience in and on the water that would allow individuals with suitable skills and abilities *relating to the specific recreation activity for which the water right is being sought* to partake in that activity." 2 Colo.Code Regs. § 408–3 (2001) (emphasis added). Therefore, by its own rules, the CWCB may not look beyond an applicant's sought recreation experience; nothing in the Board's definition authorizes it to consider the reasonableness of an applicant's intended recreation experience or the efficacy of other, unintended recreation experiences.

In addition, no other interpretation of the statute makes sense when the statute is read as a whole. *See, e.g., Frazier,* 90 P.3d at 811; *Bd. of County Comm'rs,* 88 P.3d at 1193. This is because the CWCB is required to make factual findings, and the water court is to treat these findings as presumptively valid: "[t]he water court shall apply the factors set forth in section 37–92–102(6). All findings of fact contained in the recommendation of the Colorado [W]ater [C]onservation [B]oard shall be presumptive as to such facts, subject to rebuttal by any party." § 37–92–305(13). Yet, unless the CWCB reviews the application purely as submitted, including an applicant's plans and intent for the use of the water right, the CWCB's findings of fact and recommendation are meaningless once the application moves from the CWCB proceedings to the adjudication in the water court.

The facts of this case are illustrative. Here, the CWCB evaluated the five statutory factors, but only "subject to the amounts specified below,"—a stream flow of 250 cfs during May through September, and 0 cfs during the rest of the year. No attempt was made to assess the application using the variable stream flows sought by Applicant, or to make a recommendation based on Applicant's intent to provide a kayak course capable of being utilized by all skill levels throughout the recreational boating season, even as stream flows decreased. Instead, the findings and recommendation made by the CWCB literally ignored the application before it in favor of opining generally on its perception of the appropriate stream flow and more reasonable recreation experience.

As a result, the water court received no guidance from the CWCB about how Applicant's plans might affect the five statutory factors under consideration. Indeed, the water court "struggle[ed] with precisely what findings of fact were made by the CWCB," noting that the "CWCB does not find that the amounts applied for either do or do not comport with the [statutory] factors." Thus, even if we could disregard the plain language establishing the CWCB's constrained review role as Appellants ask, we would in effect render the water court's subsequent analysis unworkable and the statutory scheme as a whole inconsistent, disharmonious, and insensible. *See, e.g., Bd. of County Comm'rs,* 88 P.3d at 1193; *see Mountain City Meat,* 919 P.2d at 253.

Furthermore, although the statutory language is clear, we note that SB 216's legislative history comports with our plain language analysis. As originally introduced, the bill would have given the CWCB in cases involving more than fifty cfs the authority it is presently asserting, that is the authority to determine what amount of water is appropriate for the RICD in question, irrespective of the applicant's planned use of the water right. S. 216, 63rd Gen. Ass., 1st Reg. Sess. (Colo. Apr. 5, 2001); *see also* Transcript of Audio Tape: Hearing on SB01–216 Before the Senate Comm. on Pub. Policy and Planning, 63rd Gen. Ass., 1st Reg. Sess. (Colo. Apr. 12, 2001) (on file with Colorado State Archives) [hereinafter Apr. 12 Senate Hearings]; Transcript of Audio Tape: Hearing on SB01–216 Before the Senate Comm. on Pub. Policy and Planning, 63rd Gen. Ass., 1st Reg. Sess. (Colo. Apr. 18, 2001) (on file with Colorado State Archives) [hereinafter Apr. 18 Senate Hearings].[4] That version did not pass, however, and the General Assembly,

---

4. For example, the proposed legislation provided that: "[t]he Colorado Water Conservation Board's final recommendation ... shall be subject to review on the administrative record."

after substantial debate, substantially modified the legislation. *See generally* Apr. 12 Senate Hearings; Apr. 18 Senate Hearings; Transcript of Audio Tape: Senate Deb. on SB01–216, 63rd Gen. Ass., 1st Reg. Sess. (Colo. May 3, 2001) (on file with Colorado State Archives). As discussed above, SB 216, in its final form, limits the entities that can claim RICD water rights, and specifically delineates the role of the CWCB, only authorizing it to conduct fact-finding with respect to specific factors and to make a recommendation. Yet, the final version does not give the CWCB the extensive oversight and adjudicatory authority it sought, nor does it give the CWCB any authority to dictate a flow rate or recreation experience for RICD water rights.

While constrained, the CWCB's role under SB 216 is not unimportant. Reviewing a RICD application under the five statutory factors no doubt requires the Board to undertake a careful, probing analysis. For example, section 37–92–102(6)(b)(I) directs the CWCB to find whether the adjudication and administration of the sought RICD "would impair the ability of Colorado to fully develop and place to consumptive beneficial use its compact entitlements." Thus, whether a RICD shields waters from a consumptive use that would otherwise be available under a particular compact is a factor for the CWCB to consider in reaching its recommendation. This duty is consistent with the CWCB's enabling statute which in turn, directs the Board to pay particular attention to development of Colorado's interstate water apportionments. *See* § 37–60–106(1)(h), (i), C.R.S. (2004).

In addition, section 37–92–102(6)(b)(V) directs the CWCB to find whether adjudication and administration of the RICD application "would promote maximum utilization of waters of the state" as envisioned by section 37–92–102(1)(a) which incorporates a basic tenet of Colorado water law into RICD applications. Again, this duty is consistent with the Board's enabling statute, under which the CWCB has the duty "to promote the conservation of the waters of the state of Colorado in order to secure the greatest utilization of such waters." § 37–60–106(1). To this end,

the CWCB is to promote the implementation of "sound measures to enhance water use efficiency in order to serve all the water needs of the state." § 37–80–106(1)(r).

If in considering an applicant's claimed stream flows for compliance with the five statutory factors, the CWCB determined, for example, that the RICD would impair the availability of upstream consumptive uses of compact-entitled water, or that the RICD would not conserve or efficiently use the claimed water, thereby promoting maximum utilization of Colorado's available water, then the Board could recommend to the water court that the application be denied. An applicant does not have an entitlement to a "grant" recommendation from the CWCB merely upon a showing of water availability. Rather, the Board has the authority to recommend denial where an application strictly as submitted by the applicant does not comport with the five statutory factors in section 37–92–102(6)(b).

[7] In the case before us, the CWCB has not made findings on whether beneficial consumptive water use opportunities upstream from the claimed RICD would further develop Colorado's compact entitlements and would be impaired by Applicant's sought for stream flow amounts. Moreover, no findings were made on whether Applicant's claimed stream flows would conserve and efficiently use the available Gunnison River flow, thereby promoting maximum utilization of Colorado's waters. Since the CWCB has not made all of the findings required by these and the other statutory factors codified at section 37–92–102(6)(b)(I)–(V), the water court lacks information that the General Assembly considered material to the water court's ultimate determination regarding the amounts of water to which the RICD decree must be restricted.

In summary, the interpretation urged upon us by Appellants is not supported by either the plain language of SB 216 as a whole or the legislative history. Indeed, based on the record below, it is difficult for us to determine whether the CWCB "denied" the application because Applicant sought more than the 250 cfs suggested, or "granted" the application, but only upon condition that it be

limited to 250 cfs. No matter which way one views the record, the CWCB's limitation of Applicant's claimed RICD to 250 cfs was in clear violation of the plain language of SB 216, which requires the Board to review the application strictly as submitted by the applicant, make the requisite statutory findings of fact, and formulate a recommendation to the water court.[5]

### B. The Role of the Water Court

Appellants also necessarily ask us to interpret the water court's role under SB 216. We start our analysis with the water court's consideration of the CWCB's findings of fact and recommendation.

As with any other application for a conditional water right, the water court is charged with adjudicating a RICD application. However, SB 216, as codified, imposes additional analytical burdens. First, the findings of fact set forth by the CWCB "shall be presumptive as to such facts, subject to rebuttal by any party." § 37–92–305(13). Additionally, the bill requires the water court to "apply the factors set forth in section 37–92–102(6)." § 37–92–305(13). These statutory provisions raise three questions: is the CWCB's recommendation as well as its factual findings entitled to presumptive effect; what meaning should be given to the term "presumptive;" and assuming the presumption has been rebutted, by what standard should the water court weigh evidence pertaining to the statutory factors?

### 1. The Presumptive Effect of the CWCB's Findings

■ The plain language of the bill as codified, *see, e.g., In re 2000–2001 Dist. Grand Jury*, 97 P.3d at 924, imparts presumptive effect only upon the CWCB's findings of fact; contrary to Appellants' contention, the Board's recommendation does not have a presumptive effect before the water court. Section 37–92–305(13) states that only the "findings of fact *contained within* the recom-

mendation . . . shall be presumptive." (emphasis added). The recommendation, according to section 37–92–305(16) is "a part of the record to be considered by the water court," but this does not imply that it therefore is presumptive. *See, e.g., Pierson*, 48 P.3d at 1218–19; *see Scoggins*, 869 P.2d at 205. Straining the statute to conclude otherwise would lead to an unworkable and absurd result. *See, e.g., Frazier*, 90 P.3d at 811; *Bd. of County Comm'rs*, 88 P.3d at 1193. Findings of fact certainly can be rebutted, and consequently, such evidence could discredit the CWCB's recommendation. Still, the recommendation itself is just that—a recommendation; functionally, it cannot be rebutted as can factual findings. Thus, we hold that only the Board's findings are to be given presumptive effect.

■ We turn next to the meaning of the term "presumptive" in SB 216. Statutory terms with a technical meaning, even if acquired by other than legislative definition, are construed accordingly. *E.g., Bill Boom*, 961 P.2d at 470. Since SB 216 does not define "presumptive," we must look elsewhere for a technical meaning. Such is provided in Colorado Rule of Evidence 301:

> In all civil actions and proceedings not otherwise provided for by statute or by these rules, a presumption imposes upon the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of non-persuasion, which remains throughout the trial upon the party on whom it was originally cast.

Applied to SB 216, this means that if no party presents any evidence to the water court on the statutory factors, then the water court must presume the CWCB's findings on those factors correct. However, should any party present evidence on the statutory factors, the presumptive effect of the CWCB's findings has been rebutted, and the water court must then weigh the evidence before it.

---

5. Of course, as it did in the present case, the CWCB can recommend granting the application subject to certain conditions arising under the statutory factors upon which it has found facts. For example, here the CWCB recommended to

the water court that "[t]he RICD will not be in effect or exercised during any time when the hydrograph would permit the Redlands Power Canal water rights or the Gunnison Tunnel water right to call for their senior water rights."

Thus, the water court properly determined that any party disagreeing with the CWCB's findings had a burden of going forward with evidence to rebut or meet the presumption. This burden of production, it should be noted, does not shift the overall burden of proof which remains on the applicant throughout adjudication.

■■■ Finally, we turn to the question of the applicable burden of proof. After considering the evidence presented at trial, the water court held, based on the totality of the evidence presented, that Applicant had rebutted the erroneous presumption that 250 cfs was the appropriate quantity of water by producing contrary evidence. In so holding, the water court specifically rejected Appellants' request to impose a higher burden of proof—i.e., clear and convincing evidence—or a higher standard of review such as for arbitrary and capricious agency action. We agree that the appropriate standard is the preponderance of the evidence.

Section 13–25–127(1), C.R.S. (2004), provides that "the burden of proof in any civil action shall be by a preponderance of the evidence." Nothing in SB 216 elevates this default burden of proof, and CRE 301 clearly states that the burden of production does not affect the applicable burden of proof. Moreover, in another water rights context, we repeatedly have held that the preponderance of evidence standard applied where a statutory presumption of abandonment arose and no standard was specified. *E.g., Haystack Ranch, LLC v. Fazzio,* 997 P.2d 548, 552 (Colo.2000).

By urging a higher standard such as clear and convincing evidence or arbitrary and capricious review, the CWCB is fashioning for itself the role of an administrative adjudicatory agency or a quasi-judicial body—a role which, as discussed above, was specifically rejected by the General Assembly. SB 216 does not grant the CWCB the authority to review RICD applications as an administrative adjudicatory agency or quasi-judicial

body, and thus, its findings are not entitled to a corresponding deferential standard.[6]

In summary, we hold that any party who opposes the findings of the CWCB has the burden of going forward with evidence to rebut that presumption. Absent such evidence, the findings of the CWCB are binding on the water court. Should such evidence be produced, the water court must evaluate the contested factors anew, and using a preponderance of the evidence standard, make findings of fact with respect to the contested factors.

**2. The Water Court Must Limit a RICD Water Right to the Minimum Stream Flow Necessary for a Reasonable Recreation Experience in and on the Water**

■■■ Appellants also argue that the water court erred when it refused to limit Applicant's claimed RICD to the minimum stream flow for a reasonable recreation experience in and on the water. We agree. The water court should have given effect to the plain language of SB 216 and erred by concluding that the General Assembly intended a claimed RICD to be adjudicated under a pre-SB 216 beneficial use analysis alone.

■■■■ In addition to the rules of statutory construction already recited, when examining a statute's plain language, we give effect to every word and render none superfluous, *e.g., Slack,* 5 P.3d at 284, because "[w]e do not presume that the legislature used language 'idly and with no intent that meaning should be given to its language,'" *Carlson v. Ferris,* 85 P.3d 504, 509 (Colo. 2003) (quoting *People v. J.J.H.,* 17 P.3d 159, 162 (Colo.2001)). Words and phrases are read in context and construed literally according to common usage "unless they have acquired a technical meaning by legislative definition." *People v. Yascavage,* 101 P.3d 1090, 1093 (Colo.2004) (citing §§ 2–4–101, 2–4–212, C.R.S. (2004); *J.J.H.,* 17 P.3d 159 (Colo.2001)). Thus, "when the legislature defines a term ... that definition governs."

---

**6.** It should be noted that the CWCB is not always required to hold a hearing when reviewing RICD applications. § 37–92–102(6)(a) ("Following a public hearing, if requested by any party ....").

And, even though a hearing was held in this case, the rules of evidence were not applied and cross-examination was not allowed.

*Bill Boom,* 961 P.2d at 470 (citing *R.E.N. v. City of Colorado Springs,* 823 P.2d 1359, 1364 (Colo.1992)). Except where the General Assembly plainly evidenced a contrary intent, such a definition controls wherever the term is used throughout the statute. *Bill Boom,* 961 P.2d at 470 (citing, *inter alia, R.E.N.,* 823 P.2d at 1364).

Section 37–92–305 establishes the standards for the water courts' adjudication of all conditional water rights. According to paragraph (9)(a) of that section, "[n]o claim for a water right may be recognized or a decree therefore granted except to the extent that the waters have been diverted, stored, or otherwise captured, possessed, and controlled and have been applied to a *beneficial use.*" (emphasis added). As redefined by the General Assembly in SB 216, a beneficial use is:

> [T]he use of that amount of water that is reasonable and appropriate under reasonably efficient practices to accomplish without waste the purpose for which the appropriation is lawfully made and, without limiting the generality of the foregoing, includes the impoundment of water for recreational purposes, including fishery or wildlife, and *also includes the diversion of water by a county, municipality, city and county, water district, water and sanitation district, water conservation district, or water conservancy district for recreational in-channel diversion purposes*
> . . . .

§ 37–92–103(4) (emphasis added). Thus, beneficial use now expressly includes diversions of water "for recreational in-channel diversion purposes." To give full effect to the General Assembly's intent, we thereby are directed to the definition of a RICD, *see Bill Boom,* 961 P.2d at 470:

> "Recreational in-channel diversion" means the minimum stream flow as it is diverted, captured, controlled, and placed to beneficial use between specific points defined by physical control structures pursuant to an

application filed by a county, municipality, city and county, water district, water and sanitation district, water conservation district, or water conservancy district for a reasonable recreation experience in and on the water.

§ 37–92–103(10.3).

Reading the two definitions together as we must, *see Bill Boom,* 961 P.2d at 470, and construing them as written, *see, e.g., Pierson,* 48 P.3d at 1218–19, it is clear that the General Assembly intended beneficial use to encompass in-channel recreational uses of water, but only those uses which are limited to the "minimum stream flow" "for a reasonable recreation experience in and on the water." If an in-channel recreational appropriator seeks more than the minimum stream flow for a reasonable recreation experience in and on the water, then by definition, that would-be appropriator's intended use is not a beneficial use. As a result, RICD applications require proof of these two additional elements before the water court may decree a conditional water right.[7]

To read SB 216 otherwise would disregard its plain language, *see, e.g., In re 2000–2001 Dist. Grand Jury,* 97 P.3d at 924; *Pierson,* 48 P.3d at 1218–19, and render the RICD definitional language superfluous, failing to give effect to every word used by the General Assembly, *see, e.g., Slack,* 5 P.3d at 284. Indeed, if the General Assembly had not intended the definition of a RICD to have a separate meaning, then it would not have added it to the definition. *See, e.g., Carlson,* 85 P.3d at 509.

In short, we hold that the starting point for the water court's analysis of a RICD application is the definition of a RICD provided by the General Assembly. Unless the application is limited to the minimum stream flow for a reasonable recreation experience in and on the water, it does not satisfy the beneficial use requirement, and the application cannot be granted. The more difficult

---

7. Of course, an applicant also must show that it falls within the appropriate "class" of applicants—a county, municipality, city and county, water district, water and sanitation district, water conservation district, or water conservancy district. § 37–92–103(10.3). Furthermore, an applicant must demonstrate that it is diverting, capturing, controlling, and beneficially using the water between specific points defined by physical control structures. § 37–2–103(10.3). The satisfaction of these elements, however, is not contested in this case.

issue, however, is determining exactly what the General Assembly meant by its RICD definition and in particular, the phrases "minimum stream flow" "for a reasonable recreation experience in and on the water."

Within the context of the RICD statutory definition, we address first the phrase "minimum stream flow," construing it literally according to common usage. *See, e.g., Yascavage,* 101 P.3d at 1093. Comporting with common usage, *Black's* defines "minimum" as "[o]f, relating to, or constituting the smallest acceptable or possible quantity in a given case." Bryan A. Garner, ed., *Black's Law Dictionary* 1010 (7th ed.1999). Accordingly, as used in the RICD definition, minimum stream flow means the least necessary stream flow to accomplish a given reasonable recreation experience in and on the water.

The latter phrase in the RICD definition, "reasonable recreation experience in and on the water," does not have a common usage of which this Court has been made aware. Indeed, the reasonableness of a given recreation experience such as whitewater kayaking may vary by the appropriator's perspective. A casual kayaker, for example, may be satisfied with low to moderate flows, while an expert probably demands higher stream flows. Also, some non-kayakers may consider enough stream flow to merely float the kayak reasonable. Thus, the term has no plain meaning that we can apply as written. *See, e.g., In re 2000–2001 Dist. Grand Jury,* 97 P.3d at 924; *Pierson,* 48 P.3d at 1218–19.

▮▮▮▮ In addition, the General Assembly did not define the phrase, and we know of no otherwise acquired technical meaning that we must consider.[8] *See Bill Boom,* 961 P.2d at 470. Where a statutory word or phrase, not defined by the legislature, has no plain meaning or is reasonably susceptible to multiple meanings, we are faced with an ambiguity and must explore extrinsic aids to construction. *See In re 2000–2001 Dist. Grand Jury,* 97 P.3d at 924; *City of Colorado*

*Springs v. Powell,* 48 P.3d 561, 564 (Colo. 2002). These other sources include the statute's legislative history. *E.g., Grant v. People,* 48 P.3d 543, 546 (Colo.2002). Yet, in determining the legislature's intent, never may we substitute our own public policy determinations for those of the General Assembly. *E.g., Concerned Parents of Pueblo, Inc. v. Gilmore,* 47 P.3d 311, 313 (2002).

▮▮▮▮ There are a variety of recognized sources of the General Assembly's intent within a statute's legislative history—namely, "the object the legislature sought to obtain by the enactment, the circumstances under which it was adopted, and the consequences of a particular construction." *Anderson v. Longmont Toyota, Inc.,* 102 P.3d 323, 327 (Colo.2004) (citing § 2–4–203(1), C.R.S. (2004); *Weld County Sch. Dist. RE–12 v. Bymer,* 955 P.2d 550, 554 (Colo.1998)). The circumstances of a statute's enactment more specifically include "the state of the law prior to the legislative enactment," "the problem addressed by the legislation," *Bill Boom,* 961 P.2d at 470 (citing cases), and the chosen statutory remedy, *People v. Murphy,* 919 P.2d 191, 194 (Colo.1996) (citing *People v. Davis,* 794 P.2d 159, 180 (Colo.1990)). Since the undefined phrase "reasonable recreation experience in and on the water" has no plain meaning and is reasonably susceptible to multiple meanings, it is ambiguous; therefore, in accordance with the foregoing rules, we must explore extrinsic aids such as SB 216's legislative history in order to determine the General Assembly's intent.

The legislative history establishes that SB 216 was enacted, at least in part, in response to fears that under *Fort Collins,* 830 P.2d 915, appropriators could obtain high recreational in-channel flows, severely hindering Colorado's future development by either exporting or just tying up large amounts of water. According to Senator Entz, SB 216's sponsor in the Senate:

> RICD applications; that authority was granted exclusively to the water court. Thus, our rules concerning judicial deference of authorized agency interpretations are inapplicable. *See, e.g., Coffman v. Colo. Common Cause,* 102 P.3d 999, 1005 (Colo.2004).

---

8. We deem it improper to defer to the CWCB's definition of a "reasonable recreation experience." *See supra* Part III.A. No party argues for such deference, and as already discussed, the CWCB's role under SB 216 is strictly limited to an initial fact-finding. The Board does not possess authority to conduct agency adjudications of

"Entities could use the current law [Senate Bill 87–212, Ch. 269, 1987 Colo. Sess. Laws 1305 (codified as amended at § 37–92–102(3), C.R.S. (2004)) ] to claim very high flows at the State borders to essentially export water to California, Kansas and other states for use outside the State of Colorado. And if Senate Bill 216 does not pass this year, the flood gates could be opened and we'd have a run on the courthouse."

Apr. 12 Senate Hearings (statement of Sen. Lewis H. Entz). Representative Spradley, the House sponsor, concurred:

"A need for this legislation has come as a result of certain local districts filing very large water claims for in-channel water diversions for recreational purposes. These are for boat chutes and kayak runs primarily. It makes sense that attention be given to the impact of these recreational uses on our state's future abilities to development and use of water resources."

Transcript of Audio Tape: House Deb. on SB01–216, 63rd Gen. Ass., 1st Reg. Sess. (Colo. May 8, 2001) (statement of Rep. Lola Spradley) (on file with Colorado State Archives). In addition, testimony during the Senate hearings on SB 216 bolstered this concern:

"Now, here are two existing decrees for water rights of this type. One is Ft. Collins, the other is Littleton. Ft. Collins got a decree for thirty cfs on the Poudre River; Littleton got a decree for 100 cfs on the South Platte River . . . ." "Those kinds of cases are not the problem. It's the big filings that have recently been made, first by Golden, and in December several more in the range of 500 or more cfs . . . ."
"One of the realities you've heard people say is that if a 1,000 cfs water right on Clear Creek is decreed or a 500 cfs water right on other smaller streams is decreed, that effectively ties up the entire unappropriated flow of that stream. It will effectively prevent the construction of junior upstream storage projects. It will effectively prevent exchanges from happening in the future . . . ."

Apr. 18 Senate Hearings (statement of Mike Shimmin) [9] (on file with Colorado State Archives).[10]

Having articulated the problem, the General Assembly then turned its attention to formulating a solution to "the ultimate policy question" of "how do you decide how much [water] is enough to float boats for legitimate recreational purposes" because whitewater courses "can be designed to use water at fifty cfs and they can probably be designed for world class expert paddlers to use water at 1,000 cfs. The question is where in the middle of that spectrum is the justifiable line to be drawn." *Id.*

Several senators on the Senate Committee on Public Policy and Planning suggested the need for RICD-specific standards in addition to those already considered by water courts such as speculation and waste under the beneficial use analysis. For example, Senator Pascoe, the committee chair, inquired:

Sen. Pascoe: "Senator Anderson, could you tell me what you have in mind when you talk about standards? Standards relating to what?"

Sen. Anderson: "Well, quantity, because we're talking cubic feet per second of flow."

Sen. Pascoe: "You mean [unintelligible] like a limit?"

Sen. Anderson: "Well, it's going to have to be somewhere, but you don't take the whole stream. Because if you take the whole stream, then you know you've got trouble. And where is the place in between that's reasonable?"

---

9. According to the transcript of the April 18 Senate Hearings, Mike Shimmin then was an attorney practicing water law in Boulder, Colorado. While he successfully represented the City of Fort Collins in the *Fort Collins* litigation, Shimmin explained that he was not appearing before the committee to represent the city's interests either for or against SB 216.

10. There certainly were a few contrary voices in the General Assembly, questioning whether SB 216 was premature until Golden's water right had been adjudicated. This dissent however, was clearly a minority view that did not prevent SB 216's enactment.

*Id.* One exchange between Senator Perlmutter and Mike Shimmin is particularly revealing:

> Mike Shimmin: "Now, the reason the bill is proposed is that current law provides only a scarce bit of general guidance on the issue of how much water is enough."

> Sen. Perlmutter: "Mike, we've used this approach of reasonableness for years and years and years and years. I mean why is this recreational use any different than, say, a farmer who if he used some sort of drip type irrigation method would use about a zillionth of what is now just sort of flowing through the fields? Why don't we create standards of conservation or minimal use or something else with respect to some other type of use, whether it's for domestic drinking water or agricultural use. I mean we've allowed the courts this great latitude to deal with it on a case-by-case basis. Why in this instance do we have to come up with some specifics and try to micromanage it?"

> Mike Shimmin: "First of all, I think the concern about this particular water right is that with a fairly modest investment, a city or other entity can effectively tie up the entire flow of the river. And that is not true with most conventional or traditional uses of water ...."

> Sen. Perlmutter: "Yeah, we're using Golden and its 1,000 cfs and, you know, I mean it's the old adage of pigs get fat and hogs get slaughtered. And it may be that that request was so great that it's alarmed the entire water community out there. But are you telling me there are no standards by which a court can say 1,000 cfs is inappropriate, is unreasonable and should not be granted?"

> Mike Shimmin: "I would say right now there's no specific guidance in the law to help the court draw that line .... One judge may hear the facts and say, 'Gee, 700 is reasonable, given what I've heard.'

Another judge could hear the facts and say, '200 or 100 is reasonable ....' "

*Id.*

Not everyone was in agreement. At an earlier hearing, one witness argued against enumerated stream flow limits, explaining that variable stream-specific factors were a more important consideration:

> "The bill is also anti-recreational diversions because it limits these kind of diversions to minimum flows. I don't know what that means, but no other water right in Colorado is required to be limited to minimum flows. It's limited to the amount applied to beneficial use with efficiency [unintelligible]. standard. If you limit whitewater courses to minimum flows, it means you won't have first rate whitewater courses in the state.

> . . .

> If the concern has to do with impacts and other water rights, which has been some of the testimony, does it really matter if the water right is one cfs or 100 cfs or 1,000 cfs? As much as what matters is where is the water right located, where are the other senior water rights on the stream, and what's the call regiment, what kind of agreements exist in place in the stream?"

Apr. 12 Senate Hearings (statement of Steve Bushong).[11] Such other factors, according to the witness, were already being addressed within the current adjudication scheme: "[t]hose are the things that really decide whether or not a water right's going to impact other water rights, and that's precisely the kind of case-by-case analysis that goes on in the water court." *Id.*

Ultimately, the General Assembly did not agree either that additional guidelines were unnecessary or that an enumerated permissible stream flow range was appropriate, as evidenced by its chosen remedy. Confronted with the perceived problem of appropriators obtaining high recreational in-channel flows as beneficial uses, the General Assembly chose to impose limits by defining which

---

11. According to the transcript of the April 12 Senate Hearings, Steve Bushong then was a partner in the law firm of Porzak, Browning, and Bushong. He was speaking before the committee on behalf of a number of entities including the Town of Vail, the Town of Breckenridge, the Eagle River Water and Sanitation District, the City of Golden, and the Vail Valley Chamber of Commerce.

recreational in-channel flows constituted beneficial uses—SB 216's restrictive definition of a RICD in section 37–92–103(10.3)—and establishing adjudication standards—the statutory factors in section 37–92–102(6)(b).

Surprisingly, however, there is almost no specific mention in the final bill of what a reasonable recreation experience in and on the water was intended to mean, despite a plea by some for an unambiguous definition.[12] Perhaps the best statement of the bill's intent regarding the definition comes from SB 216's House sponsor, Rep. Spradley:

> "[The bill defines] 'recreational in-channel diversions' such that only the 'minimum' flow necessary to support the recreational activity can be sought .... By way of example, this would mean that an applicant could potentially obtain a right to the minimum amount of water necessary to float a kayak through a constructed course consisting of boat chutes within the reach, such that there would exist a reasonable recreation experience, while ensuring that the entire flow of the reach is not dedicated to this right."

*Id.* Thus, according to the only legislator to specifically address it, the RICD definition essentially provides flexibility, requiring that a recreation experience in and on the water be reasonable considering the water availability of a particular stream reach. At a minimum, merely floating a kayak could be a reasonable recreation experience on some reaches, while at a maximum, a world-class expert course requiring nearly the entire flow of a given stream could be reasonable. By implication, the reasonableness of an appropriator's sought recreation experience is directly related to the available, unappropriated stream flow, thereby depending entirely upon the river basin on which it is sought. Consequently, not all rivers and streams in the state may support world-class whitewater courses despite a particular appropriator's intent, and some may have so little available flow that only floating a kayak would be reasonable.

Putting the above legislative history together with the language of the statute, we hold that the phrases "minimum stream flow" "for a reasonable recreation experience in and on the water" should be interpreted in the following manner.[13] Initially, the water court must determine whether an application is for a RICD as defined in section 37–92–103(10.3). To do so, the water court first must determine whether the appropriation sought by the applicant, viewed objectively, is for a reasonable recreation experience in and on the water—more specifically, are the requested flow amounts reasonable on the particular stream? This determination necessarily will vary from application to application, depending on the stream involved and the availability of water within the basin.[14] Once the water court has determined whether a RICD application is for an objectively reasonable recreation experience in and on

12. One hearing witness, speaking for the CWCB, implied that a statutory definition was required so that non-consumptive, in-channel recreational uses would be limited in a manner reasonably equivalent to the inherent physical limitations of consumptive uses:

> "I think if you look at the [RICD] definition, it's an attempt to fit this water right into the process we have now. It talks about minimum amount of water necessary to accomplish a reasonable recreational experience. I think [unintelligible]. Reasonable and recreational are two words that are used in there.
> And I do think that it's consistent with the test that other water users have to comply with because any water user, be it agricultural, municipal or industrial, is governed by the test of efficiency where it's not all the water they can physically get a hold of, but it's all the water that they can reasonably and efficiently use. And that really becomes the test of what those

water rights can appropriate. And I think by this definition, we have placed this water right in the same light that the other water right classifications are."

*Transcript of Audio Tape: Hearing on SB01–216 Before the House Comm. on Agric., Livestock, & Natural Res.*, 63rd Gen. Ass., 1st Reg. Sess. (Colo. May 7, 2001) (statement of Rod Kuharich, Director, CWCB) (on file with Colorado State Archives).

13. Again, we are mindful that if the General Assembly disagrees with our interpretation, it may amend the statute. *See Juvenile Court*, 893 P.2d at 89.

14. Thus, as suggested above, in an over appropriated stream basin, for example, it likely would not be objectively reasonable to have a world-class or championship level white-water course, but it might be objectively reasonable to have a more leisure-oriented course.

the stream in question, then it must determine the minimum amount of stream flow necessary to accomplish that intended recreation experience. Hence, the water court may be required to weigh conflicting expert testimony given by course designers or other interested parties, and make a finding as to the least necessary stream flow to achieve an applicant's objectively reasonable recreation experience.

█ In any event, it is clear from the plain language of the statutory definition of a RICD, as well as SB 216's legislative history, that the water court may not take the appropriator's suggestion, as set forth in the application, of what a reasonable recreation experience is for the stream involved at face value, nor should the water court accept without scrutiny the applicant's analysis of what stream flow is necessary to achieve that objective.

█ Finally, in making the above determinations, the water court must carefully evaluate the factors set forth in section 37–92–106(6)(b), giving presumptive effect to unrebutted CWCB findings, and also considering the Board's recommendation and any other evidence submitted in the course of the trial. An applicant is not entitled to a decreed RICD merely upon a showing of water availability. The water court only may decree a RICD that is appropriate under the five statutory factors—compact impairment, stream reach appropriateness, access availability, instream flow rights injury, and maximum utilization.[15]

### C. Application

For the foregoing reasons, we hold that both the CWCB and the water court erred. The CWCB exceeded its authority when it made findings of fact and formulated a final recommendation on considerations beyond Applicant's intended recreation experience, ignoring the application before it in favor of opining generally on its perception of the appropriate stream flow and more reasonable recreation experience. By doing so, the CWCB failed to fulfill its mandate to provide findings on whether Applicant's claimed stream flows were inappropriate under the five statutory factors and a final recommendation upon such limited fact-finding that the water court grant, grant with conditions, or deny the RICD application.

Since the "CWCB d[id] not find that the amounts applied for either do or do not comport with the 102(6) factors," *see supra* Part I., the water court received no guidance from the Board about how Applicant's plans might affect the five statutory factors under consideration, and the water court could not treat as presumptively valid factual findings that had not been made. Accordingly, we remand this case to the water court with instructions to remand to the CWCB for factual findings on whether the application—strictly the stream flows and recreation experience submitted—comports with the five statutory factors.

The water court also erred. In granting a conditional water right to Applicant, the water court misconstrued and misapplied SB 216 to the application by failing to give effect to the phrases "minimum stream flow" "for a reasonable recreation experience in and on the water" as required by the statutory definition of a RICD. Therefore, the decree awarding Applicant the requested stream flows in full was based upon an incomplete analysis and must be vacated. In addition to reexamining the five statutory factors on remand, should the CWCB's findings be rebutted, we also direct the water court to determine whether Applicant's intended in-channel recreational diversion is in fact a RICD as defined by statute and thereby a beneficial use. If Applicant's claimed RICD is not a RICD by definition or does not satisfy the five statutory factors, then the water court cannot decree a conditional water right in the amounts requested; rather, the water court would have to reduce the stream flows to the level that Applicant's appropriation would comport with the statutory factors and encompass only the mini-

---

15. Of course, the water court would have to make all the other findings required by the Water Right Determination and Administration Act of 1969, including, for example, whether the RICD would accomplish its purpose without waste, *see* § 37–92–103(4), and whether the diversion and beneficial use can and will be accomplished within a reasonable time, *see* § 37–92–305(9)(b).

mum necessary for a reasonable recreation experience in and on the water.

## IV. Conclusion

In SB 216, the General Assembly established a procedure for the adjudication of instream diversions by local government entities for recreational uses. The CWCB was granted initial, limited fact-finding authority on enumerated factors as applied strictly to an applicant's claimed stream flow and intended recreation experience; stream flows or recreation experiences not intended by the applicant cannot be considered. The water court, in contrast, was charged with adjudication of a RICD application, and must consider the five statutory factors—compact impairment, stream reach appropriateness, access availability, instream flow rights injury, and maximum utilization—and treat the CWCB's factual findings on these factors presumptively. Should any party produce evidence contrary to the CWCB's findings, the presumption is rebutted, and the water court must weigh the evidence before it under a preponderance of the evidence standard.

In addition to the five factors as well as all applicable pre-existing statutory standards for adjudication of conditional water rights, the water court must determine whether an application is limited to the minimum stream flow necessary for an objectively reasonable recreation experience in and on the water. If not, then an applicant has not satisfied the fundamental elements of a RICD because any appropriation in excess of the minimum stream flow for a reasonable recreation experience in and on the water does not put water to a beneficial use.

Here, both the CWCB and the water court erred. By considering stream flow amounts and recreation experiences other than those intended by Applicant, the CWCB exceeded its review authority under SB 216 and gave the water court no guidance regarding how Applicant's plans might affect the five statutory factors under consideration. Moreover, since the water court did not consider whether Applicant's intended in-channel recreational diversion was in fact a RICD as defined by SB 216, the water court erred when it awarded Applicant a decree in the claimed stream flow amounts. For these reasons, we reverse the order and decree of the water court and remand this case to the water court with directions to remand to the CWCB for further proceedings consistent with this opinion.

The judgment of the water court is reversed and the case is remanded.