INDUSTRIAL CLAIM APPEALS OF-
FICE; New World Van Lines of Colora-
do, and Liberty Mutual Fire Insurance
Company, Petitioners,

v.

Carnell RAY, Respondent.

Industrial Claim Appeals Office, Sun-
nyrest Health Care, and Pinna-
col Assurance, Petitioners,

v.

Jodie Marsh, Respondent.

Industrial Claim Appeals Office; Nu
Horizon Window Systems, Inc.; and
Pinnacol Assurance, Petitioners

v.

Chris Ashmore, Respondent.

Nos. 05SC632, 05SC652, 05SC757.

Supreme Court of Colorado,
En Banc.

Oct. 23, 2006.

John W. Suthers, Attorney General, Laurie Rottersman, Assistant Attorney General, Denver, Colorado, Attorneys for Industrial Claim Appeals Office.

Zarlengo, Mott, Zarlengo and Winbourn, P.C., Scott M. Busser, Denver, Colorado, Attorneys for New World Van Lines of Colorado and Liberty Mutual Fire Insurance Company.

Michael J. Steiner, Denver, Colorado, Attorney for Pinnacol Assurance.

Bisset Law Firm, Jennifer Bisset, Denver, Colorado, Attorneys for Respondent Ray.

Alexander and Ricci, P.C., William Alexander, Jr., Colorado Springs, Colorado, Attorneys for Respondent Ashmore.

Stephanie J. Stevenson, P.C., Stephanie J. Stevenson, Colorado Springs, Colorado, Attorneys for Respondent Marsh.

Law Office of O'Toole & Sbarbaro, P.C., Neil D. O'Toole, John A. Sbarbaro, Denver, Colorado, Attorneys for Amicus Curiae Workers Compensation Education Association.

Chief Justice MULLARKEY delivered the Opinion of the Court.

## I.  Introduction

We consolidated three workers' compensation cases decided by the court of appeals for purposes of this opinion: *Ray v. Industrial Claim Appeals Office*, 124 P.3d 891 (Colo. App.2005); *Marsh v. Industrial Claim Appeals Office*, No. 04CA0911, 2005 WL 1837497 (Colo.App. Aug.4, 2005) (not selected for publication); and *Ashmore v. Industrial Claim Appeals Office*, No. 04CA1870, 2005 WL 1692850 (Colo.App. July 21, 2005) (not selected for publication). All involve employees who suffered compensable on-the-job injuries and subsequently had their employment terminated. Each employer provided health insurance as an employee benefit. At issue is whether the cost of health insurance, calculated as the amount that the claimant would pay to obtain the coverage provided by the employer under the contract of employment, is to be included in the calculation of the claimant's average weekly wage if the claimant does not purchase health insurance after his or her employment is terminated.

The court of appeals held in *Ray* that a claimant's average weekly wage must include the amount of the claimant's cost of continuing an employer's group health insurance plan regardless of whether the claimant actually purchased the insurance. *Ray*, 124 P.3d at 894–95. Similarly, the court of appeals held that the average weekly wage must include the amount of a claimant's cost of conversion to a similar or lesser plan at the expiration of the allowed term of continuing coverage. *Id.*

We granted certiorari to resolve an apparent conflict between the court of appeals' decision in *Ray* and another decision by the court of appeals in *Midboe v. Industrial Claim Appeals Office*, 88 P.3d 643 (Colo.App. 2003). We affirm *Ray* and hold that the actual purchase of health insurance is not required in order for the cost of such benefits to be included in the calculation of a claimant's average weekly wage. We also overrule *Midboe* to the extent that it is inconsistent with this opinion.

## II.  Facts

Carnell Ray was injured on the job while driving a moving van for New World Van Lines. Ray sustained serious head injuries, including frontal brain damage. New World Van Lines filed a general admission of liability for temporary total disability benefits, and shortly thereafter, Ray was terminated from his employment. Ray was subsequently notified that he could continue his employer's group health insurance coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), 42 U.S.C. § 300bb–1 (2006), by paying $602.75 per month. Although initially Ray elected to continue his health insurance coverage, he did not actually make the payment required to purchase coverage.

Ray contended at a hearing before an administrative law judge ("ALJ") that the calculation of his average weekly wage should include the cost of health insurance benefits despite his failure to pay it. The ALJ denied the request to include the cost of the benefits in the calculation of the average weekly wage and, on review, the Industrial Claim Appeals Office ("ICAO") affirmed. The court of appeals reversed the decision of the ICAO, holding that the plain and ordinary meaning of the statute defining "wages" requires the ALJ to add the cost of health insurance to the determination of a claimant's average weekly wage, regardless of actual purchase. *Ray*, 124 P.3d at 894–95.

Similar to Ray, claimants Jodie Marsh and Chris Ashmore suffered on-the-job compensable injuries, and like Ray, they did not actually purchase continuing health care coverage. Jodie Marsh was employed as a certified nursing aide at Sunnyrest Health Care, where she suffered an injury to her back. After Marsh's condition worsened and she was no longer able to work, Sunnyrest discontinued her wages and health insurance benefits. Sunnyrest advised Marsh of her right to continue coverage under COBRA, but Marsh chose not to continue her coverage under COBRA or to purchase substitute health insurance.

Marsh filed a claim for workers' compensation benefits. Calculating her temporary total disability benefits, the parties agreed that Marsh's average weekly wage was $470.51, and if she had continued her health insurance under COBRA, her average weekly wage would have been $567.59. The ALJ ruled that Marsh's average weekly wage should not include the cost of continuing health insurance because she did not actually incur that cost. On review, the ICAO affirmed the ALJ. The court of appeals reversed the ICAO in light of *Ray,* and remanded with directions to recalculate Marsh's benefits to include the cost of continuing her health insurance under COBRA. *Marsh v. Indus. Claim Appeals Office,* No. 04CA0911, 2005 WL 1837497 (Colo.App. Aug. 4, 2005) (not selected for publication).

Chris Ashmore, a fusion-welder for Nu Horizon Window Systems, Inc., sustained an injury to his wrist, and his employment ended shortly thereafter. In the dispute over his workers' compensation benefits, the ALJ denied Ashmore's request to include the cost of continuing the employer's group health insurance, $350 per month, in his average weekly wage. The ALJ ruled that the continuation cost could not be included because Ashmore did not actually purchase continuing insurance.

On appeal, the ICAO affirmed the ALJ's holding. The court of appeals, relying on its decision in *Ray,* reversed the ICAO's determination of the average weekly wage that excluded the cost of continuing health insurance, remanding the case with directions to recalculate the average weekly wage in accordance with its decision. *Ashmore v. Indus. Claim Appeals Office,* No. 04CA1870, 2005 WL 1692850 (Colo.App. July 21, 2005) (not selected for publication).

In all three cases, the ICAO, employers, and insurance companies (collectively referred to as "employers") sought certiorari review of the court of appeals' decisions construing the "wages" statute to include "the amount of the employee's cost of continuing the employer's group health insurance plan and, upon termination of the continuation, the employee's cost of conversion to a similar or lesser insurance plan," without requiring the claimant to actually purchase the coverage. *See* § 8–40–201(19)(b), C.R.S. (2006) (definitional section of the Workers' Compensation Act).

### III. Analysis

Our analysis begins, first, by discussing the evolving definition of "wages" under the Workers' Compensation Act from the Act's inception in 1919 to the most recent "wages" amendment in 1989. Second, we explore the holdings of several cases interpreting the meaning of "wages" before and after the 1989 amendment. Third, we examine in detail the rationale of *Midboe,* 88 P.3d at 643, and we find that the employers' argument in *Ray* depends on the dicta of *Midboe.* Finally, we conclude that the employers' argument lacks any foundation in either the language of section 8–40–201(19)(b) or its legislative history, and that conditioning the inclusion of

healthcare benefits in the average weekly wage on the actual purchase of such benefits would frustrate the purpose of workers' compensation.

Under Colorado's Workers' Compensation Act, the "average weekly wage" is the key part of the formula used to calculate compensation for injured workers, and it is based upon the definition of "wages" provided at section 8–40–201(19):

(a) "wages" shall be construed to mean the money rate at which the services rendered are recompensed under the contract of hire in force at the time of the injury, either express or implied.

(b) The term "wages" *shall include the amount of the employee's cost of continuing the employer's group health insurance plan, and upon termination of the continuation, the employee's cost of conversion to a similar or lesser insurance plan,* and gratuities reported to the federal internal revenue service by or for the worker for purposes of filing federal income tax returns and the reasonable value of board, rent, housing, and lodging received from the employer, the reasonable value of which shall by fixed and determined from the facts by the division in each particular case, but shall not include any similar advantage or fringe benefit not specifically enumerated in this subsection (19). *If, after the injury, the employer continues to pay any advantage or fringe benefit specifically enumerated in this subsection (19), including the cost of health insurance coverage or the cost of the conversion of such health insurance coverage, such advantage or benefit shall not be included in the determination of the employee's wages so long as the employer continues to make such payment.*

§ 8–40–201(19)(emphasis added). The underscored language above in subsection (b) addresses the inclusion of health insurance benefits in the average weekly wage.

"Wages," as statutorily defined, means the total compensation earned by a worker, including not only the hourly wage, but also certain enumerated fringe benefits or "advantages," such as gratuities, the reasonable value of board, rent, housing, lodging re-ceived from the employer, and the employee's cost of replacement health insurance. *Id.* In the context of *Ray,* injured workers receive sixty-six and two-thirds percent of their average weekly wage for a specified period of time for temporary total disability, section 8–42–105 C.R.S. (2006), and temporary partial disability claims, section 8–42–106 C.R.S. (2006).

The determination of the average weekly wage, in turn, is based on the statutory definition of "wages." *See* § 8–40–201(19)(b). However, the legislature made significant changes in the definition in 1989 that are applicable to *Ray.* From 1919 until 1989, the Workers' Compensation Act defined "wages" as "the money rate at which the services rendered are recompensed under the contract of hire in force at the time of the injury ... The term 'wages' shall include the reasonable value of board, rent, housing, lodging, or any other similar advantages received from the employer." *See* ch. 67, sec. 4, § 8–47–101(2), 1989 Colo. Sess. Laws 409, 411. The phrase "or any other similar advantages" provided a flexible means for including employment benefits not otherwise specified in the "wages" definition.

Over the years, the court of appeals decided several cases involving the meaning of "wages" under the statute. In one case, relevant to the cases now before us, the court of appeals interpreted the "other similar advantages" language in the definition to include the value of health and life insurance provided by the employer. *See Murphy v. Ampex Corp.,* 703 P.2d 632 (Colo.App.1985). In another case construing the same provision, the court of appeals held that the value of health insurance should be measured by the replacement cost that the claimant would have to pay, rather than the employer's contribution at the time of the injury. *See State Comp. Ins. Auth. v. Smith,* 768 P.2d 1256 (Colo.App.1988).

The General Assembly responded to these court of appeals' decisions, incorporating them in part, when it amended the definition of "wages" in 1989 and specified which fringe benefits were to be compensated. *See* ch. 67, sec. 4, § 8–47–101(2), 1989 Colo. Sess. Laws 409, 411; ch. 62, sec. 1, § 8–40–201(19), 1990

Colo. Sess. Laws 468, 470. The 1989 amendment struck the open-ended phrase, "or any other similar advantages," and narrowed the benefits available to the claimant that could be included in the calculation of the average weekly wage. However, it codified the court of appeals' discussion on how to compensate claimants for the loss of health insurance by specifying that "wages" shall include "the amount of the employee's cost of continuing the employer's group health insurance plan and, upon termination of the continuation, the employee's cost of conversion to a similar or lesser insurance plan." *Id.* The amendment also limited the inclusion of health insurance benefits by providing that, so long as an employer continues to pay for an employee's health insurance coverage, such cost will not be included in the calculation of the employee's wage. *Id.*

The 1989 amendment significantly changed the law. As discussed above, from its inception in 1919, the Workers' Compensation Act's definition of "wages" was written in broad, general terms to include all fringe benefits that were similar to the specific benefits enumerated in the statute. Claimants could rely on the "or other similar advantages" provision to successfully seek compensation for fringe benefits, such as health insurance, that were unknown in 1919. By eliminating that provision, the legislature restricted the workers' benefits that could be included in the average weekly wage and limited includable benefits to those explicitly set forth in the statute. Healthcare benefits were the only fringe benefits specifically added by the 1989 amendment.

The legislative history makes it clear the purpose of the 1989 amendment was to define eligible fringe benefits. Supporters of the amendment testified that the "wages" provision should be amended to designate exactly which fringe benefits to incorporate. *See* Hearing on H.B. 1322 Before the House Comm. on Agric., Livestock, and Natural Res., 57th Gen. Assembly, 1st Reg. Sess. (Tape 89–9, Feb. 8, 1989) ("Hearing on H.B. 1322"). With respect to health insurance, supporters asserted that the employee's cost of conversion to a similar or lesser health insurance plan should be included in the cal-culation of the average weekly wage, but only upon termination of employer-provided benefits. *See id.* The supporters contended that life insurance and 401(k) retirement benefits should not be included in the definition of "wages." *Id.* There was no discussion at the hearing to the effect that the terminated employee should be required to actually purchase health insurance. *Id.*

At the hearing, the Director of the Division of Labor emphasized a broad equity concern in the workers' compensation scheme where employers terminate employer-provided health insurance benefits and employees are left to find alternative coverage without the benefit of group health insurance rates. *Id.* The Director testified that the amendment would remedy this concern by allowing the value of similar or lesser health insurance coverage to be included in the average weekly wage. *Id.*

The first case construing the amended "wages" definition was *Schelly v. Industrial Claim Appeals Office*, 961 P.2d 547 (Colo. App.1998). In *Schelly*, the claimant argued that her wages should include the cost of employer-paid health care based on the value provided to her in exchange for services she rendered to the employer at the time of the injury. *Id.* at 548. However, the court of appeals took a different view and held that the average weekly wage includes the cost to the claimant of converting to a similar or lesser plan, not the employer's cost of health insurance at the time of the injury. *Id.* at 549. The court explained its position by observing that section 8–40–201(19)(b) was enacted "to insure that a disabled claimant would have access to funds for the purchase of 'similar or lesser' health insurance regardless of whether the cost was more or less than the cost of employer–provided insurance." *Id.*

Next, in *Humane Society v. Industrial Claim Appeals Office*, 26 P.3d 546 (Colo.App. 2001), the court of appeals held that the average weekly wage should include the entire amount of the health insurance premium paid jointly by the employer and employee. *Id.* at 547. The claimant in *Humane Society* paid more than half of the insurance premium to cover both herself and her dependents.

However, the employer argued that the claimant's contribution should not be included in the average weekly wage. Holding for the claimant, the court cited *Schelly* and reasoned that the 1989 amendment was enacted to ameliorate the harsh consequences to employees who lose the advantage of group rates for health insurance upon termination of their employer-provided benefits, and who are forced to purchase replacement health insurance at higher individual rates. *Id.* at 549. The court held that "had the legislature intended to exclude the cost of the employee's personal contribution ... it could have done so by adopting language that only the cost of the employer's contribution ... is included." *Id.*

Notwithstanding *Humane Society* and *Schelly,* the court of appeals in *Midboe,* 88 P.3d at 643, construed the definition of "wages" to exclude healthcare benefits when an employer continued to contribute to the insurance premium. The claimant in *Midboe* suffered a substantial injury at work, but he continued to work for his employer after the injury. As a result, the employer continued to pay its share of the claimant's health insurance premium while the claimant paid his share. *Id.* When calculating the claimant's benefits, the ALJ concluded that the *claimant's* premium payments should be included in his average weekly wage. However, the ICAO reversed. It held that when an employer continues to pay health insurance benefits, the average weekly wage should not include either the employee's or the employer's contribution to the health insurance premium because the "wages" statute explicitly bars such inclusion. Specifically, the ICAO relied on the last sentence of section 8–40–201(19)(b), which states, "If, after the injury, the employer continues to pay ... the cost of health insurance coverage ... such advantage or benefit shall not be included in the determination of the employee's wages so long as the employer continues to make such payment." § 8–40–201(19)(b), C.R.S. (2006).

The court of appeals affirmed the ICAO's decision. *Midboe,* 88 P.3d at 645–46. However, its holding was derived from its interpretation of the "wages" statute in comparison with COBRA and the parallel Colorado

statute. *Id.* The court of appeals rejected the ICAO's reasoning because it could "discern no indication that either the first or last sentence [regarding section 8–40–201(19)(b) ] is meant to control over the other." Furthermore, because the court could not determine whether " 'continuing' in the first sentence denotes the period of time when the employer still pays its share of the premiums or that the statute otherwise expresses a clear requirement that the employee's costs is always to be included," the court decided that it must examine legislative history to determine the meaning of "continuing" and "conversion." *Id.* at 645.

Under its conception of the "specialized" meaning of these terms, and the reference to these terms in various committee and floor debates on House Bill 1322, the court of appeals held that the average weekly wage should include the cost of health insurance only when a claimant has "continued" the employer's coverage at his or her own expense pursuant to COBRA, 42 U.S.C. § 300bb–1, or the parallel Colorado provision, section 10–16–108(1)(e)(I), C.R.S. (2006). The tension between *Midboe* and its predecessors *Schelly* and *Humane Society* set the stage for *Ray.*

## IV.

We turn now to the cases before us. In *Ray,* the majority relied on *Humane Society* and *Schelly* and distinguished *Midboe. Ray,* 124 P.3d at 894. Reviewing the 1989 amendment to the definition of "wages" and its legislative history, the *Ray* court found no indication that the claimant was required to purchase health insurance before its cost could be included as a fringe benefit in calculating the claimant's average weekly wage. *Id.* The court distinguished *Midboe* on the ground that, unlike *Ray,* the *Midboe* claimant's employment had not been terminated. Rather, the claimant remained employed and the employer continued to pay its share of the health insurance premiums. The *Ray* majority also declined to follow *Midboe's* reasoning. *Id.* In contrast, the *Ray* dissent relied on *Midboe* and distinguished *Schelly* and *Humane Society* as involving issues different from those in *Ray. Id.* at 895–96.

The employers argue to us that *Ray* was wrongly decided. They urge this court to include the value of an employee's health insurance as part of the average weekly wage only when an employee elects and continues coverage according to the method defined by the federal statute, COBRA, and the equivalent Colorado statute, section 10–16–108(1)(e)(I), which extends COBRA-type protections to Colorado employees not subject to the federal law. The employers argue that because Ray, Ashmore, and Marsh were unable to pay for the continuation of their health insurance premiums at the full group rate after their employment terminations, the entire benefit must be excluded from "wages" under section 8–40–201(19)(b). In other words, the employers assert that section 8–40–201(19)(b) and COBRA require the claimants in this case to actually purchase the health insurance in order for the benefit to fall under the definition of "wages." As support for their proposition, the employers rely on *Midboe.*

The claimants argue that the employers are reading restrictions into the law that do not appear in the text. They point out that COBRA is not referenced in the "wages" definition, and that section 8–40–201(19)(b) does not require an employee to purchase continuing health insurance as a condition for the inclusion of healthcare benefits in their average weekly wage. The claimants further argue that requiring employees to actually purchase replacement health insurance would frustrate the purpose of the Workers' Compensation Act. Finally, the claimants insist that the court of appeals decided *Midboe* erroneously and that the employers' reliance on that case is misplaced.

Thus, at the center of the parties' arguments is the split of authority between *Ray* and *Midboe* on the relevance of COBRA. Under COBRA, an employee who leaves his or her employment may continue health insurance coverage for eighteen months at the employee's own expense, but at the group rate. In order to "continue" coverage, the employee must notify the employer in writing that the employee exercises the right to continuation. The employer may then require partial or full payment of the coverage within thirty days of the event that terminates benefits in order to "continue" such benefits for the statutory period. *See* 42 U.S.C. § 300bb–2(2); § 10–16–108(1)(e)(I), C.R.S. (2006). The term "conversion" has a special meaning under COBRA that applies to group health plans. COBRA allows participants and beneficiaries whose coverage is terminated to convert from group health coverage to an individual policy. Group health plans must also provide participants and beneficiaries with the same option of conversion when the maximum period of continuation coverage ends. *See* 42 U.S.C. § 300bb–2(5). Finally, "termination" of continued coverage normally occurs when the statutory maximum period of coverage expires, although it can occur prior to the eighteen month period if, for instance, an employer ceases to maintain a group health insurance plan. *See id.*

In resolving the present cases, first, we reject the court of appeals' analysis in *Midboe* as dicta, unnecessary for its holding, and erroneous. As the *Ray* court noted, *Midboe* is factually distinguishable from *Ray* because *Ray* involved a claimant whose employment was terminated. The *Midboe* claimant continued to work for the same employer after his injury, and the employer continued to provide the same health insurance benefits. Our Workers' Compensation Act makes the employer's continuation of benefits a crucial distinction.

The narrow issue in *Midboe* was simply whether the amount a claimant pays as his share of the premium for group health and dental insurance coverage must be included in the calculation of his average weekly wage *when the employer continues to pay its share of the premium.* Section 8–40–201(19)(b) expressly answers that question in the negative, and there was no need for the court of appeals to seek out alternate meanings of "continuing" or "conversion." Therefore, in the present cases, the employers' reliance on *Midboe's* dicta is unavailing.

▮▮▮ Next, we look to the wording of section 8–40–201(19)(b). In construing statutes, we must give effect to the intent of the legislature by considering first the language of the statute. *Vega v. People,* 893 P.2d 107, 112 (Colo.1995) (citing *Moody v. Corsentino,*

843 P.2d 1355, 1370 (Colo.1993)). Legislative intent is determined primarily from the plain language of the statute, and secondarily if the language of the statute is unclear or ambiguous, from the statute's legislative history. *Id.* (citing *General Electric Co. v. Niemet,* 866 P.2d 1361, 1364 (Colo.1994)). In construing the language of the Workers' Compensation Act, we have previously held that the Act is "intended to be remedial and beneficent in purpose, and should be liberally construed in order to accomplish these goals." *Davison v. Indus. Claim Appeals Office,* 84 P.3d 1023, 1029 (Colo.2004).

The plain language of section 8–40–201(19)(b) says nothing that would require claimants to purchase health insurance in order for the cost of the insurance to be included in the average weekly wage. We agree with the claimant that the text of our statute does not reference COBRA and does not require the actual purchase of health insurance. The employers fail to cite any specific language in the entirety of the Workers' Compensation Act that supports their theory.

The relevant part of section 8–40–201(19)(b) provides that "wages" shall include "the amount of the employee's cost of continuing the employer's group health insurance plan, and upon termination of the continuation, the employee's cost of conversion to a similar or lesser insurance plan." The "cost" of "continuing" health insurance is a broad phrase encompassing both the price of *actually* purchasing health insurance and the price of what it *would* cost the employee to purchase health insurance. The legislature's choice of broadly inclusive language covers both categories of claimants: those who are able to purchase health insurance after termination and those who are not. Our reading of the statute is consistent with the purpose of the Workers' Compensation Act "to assure the quick and efficient delivery of

disability and medical benefits to injured workers at a reasonable cost to employers, without the necessity of any litigation ...." § 8–40–102(1), C.R.S. (2006). Adopting such language avoids the need for the technical line drawing that has resulted in prolonged litigation for Ray and the other claimants now before us.

It is a separate logical step, going beyond the plain language, to conclude that the "cost" of "continuing" health insurance necessarily means the *actual* payment of health insurance. In the absence of any language to support this meaning, we will not conclude that the statutory language is ambiguous merely because COBRA uses the terms differently. The fact that two statutes use comparable terms when referencing insurance coverage does not mean that the General Assembly had an unstated intent that COBRA would control Colorado's Workers' Compensation Act. *See Sears Roebuck & Co. v. Indus. Claim Appeals Office,* 140 P.3d 336, 338 (Colo.App.2006).[1] It is possible for a claimant to "convert" to another form of health care benefits such as Medicare, for example, without actually purchasing "continuing" coverage as defined by COBRA. *See Sears,* 140 P.3d at 338; *Schelly,* 961 P.2d at 549. As the court of appeals held in *Sears,* imposing the conversion requirements of section 10–16–108(1)(f)(Colorado's parallel statute to COBRA) onto section 8–40–201(19)(b) would limit conversion only to those policies which are issued by the insurer underwriting the employer's group policy. *Id.* In other words, if we interpreted the term "conversion" to relate only to the limitations provided under section 10–16–108(1)(f) or COBRA, Medicare benefits as well as health insurance purchased from a different insurer would be excluded from average weekly wage calculations. *See Schelly,* 961 P.2d at 549 (holding that the phrase

1. The court of appeals in *Sears* declined to "engraft" the "unambiguous" conversion provisions of section 10–16–108(1)(f)(Colorado's parallel statute to COBRA) onto section 8–40–201(19)(b) because it would preclude the inclusion in a claimant's average weekly wage of the cost of converting to other medical benefits policies like Medicare. *Sears,* 140 P.3d at 338. Citing the court of appeals opinion in *Ray,* the court noted that "section 10–16–108 governs an employee's right to actually *obtain* insurance, at the employee's expense," whereas section "8–40–201(19)(b) concerns only the cost of insurance for purposes of 'insur[ing] that disabled [employees] would have access to funds for the purchase of similar or lesser health insurance....' " *Id.* (citing *Ray,* 124 P.3d at 894).

"similar or lesser insurance" does not exclude Medicare from inclusion in the average weekly wage); *Sears,* 140 P.3d at 338. The General Assembly could not have intended this arbitrary, unfair result from its 1989 amendment. Accordingly, we hold that the plain language of section 8–40–201(19)(b) does not require a claimant to actually purchase health insurance in order to include the cost of continuing health insurance in the injured employee's average weekly wage.

Even if the absence of specific language requiring the purchase of health insurance were deemed ambiguous, our research of the legislative history, as discussed above, finds no support to link the specialized meaning of the terms "continuing" and "conversion" in COBRA to the "wages" statute. Indeed, the employers are unable to cite any relevant legislative history that supports their position. Therefore, with nothing upon which to base their argument but their own assertions, the employers' position fails. Accordingly, the entwinement *Midboe* suggested in its dicta between COBRA and section 8–40–201(19)(b) does not exist. Colorado's Workers' Compensation Act does not intend injured workers actually to purchase healthcare benefits as a condition to having such benefits included in the average weekly wage.

Finally, the employers' argument would make a sham of the 1989 amendment that specifically added health insurance to the computation of a claimant's average weekly wage. Workers' compensation benefits are akin to subsistence payments. The payments do not replace, and are not intended to fully replace, the employee's lost salary and benefits. As discussed in part III above, the three claimants involved in this case suffered temporary total or temporary partial disabilities. Each will receive compensation equal to two-thirds of their average weekly wages for a certain number of weeks. This means that the employers would have the claimants pay the full cost of their health insurance in order to be repaid two-thirds of that amount. For example, Ray would pay $602.75 per month in order to receive $401.50 as his portion of his benefits attributable to medical insurance. Clearly his benefits would be de-creased rather than increased if the employers' view of the 1989 amendment prevailed.

The employers' argument also fails to consider the significant delay that may occur between the time of employment termination and the actual receipt of workers' compensation benefits. For instance, Marsh did not in fact receive a benefit payment until over two years after her employment as a nurse's aid terminated. Nevertheless, in order to continue coverage under COBRA, she would have had to make an actual payment within thirty days after employment termination.

As the Ray and Marsh examples demonstrate, a claimant will be able to purchase health insurance after becoming unemployed only if he or she has other financial resources. Such fortunate circumstances are unlikely to exist for most workers who are injured and have lost their jobs.

For these reasons, we hold that excluding health insurance from the calculation of a claimant's average weekly wage if the claimant does not purchase the insurance violates the 1989 amendment.

## V. Conclusion

We reject the employers' argument both as unsupported by the statute and its legislative history, and as contrary to the purposes of the 1989 amendment. Section 8–40–216(19)(b) does not require claimants who lose their jobs to purchase continuing or converted health insurance under COBRA in order for the benefit of health insurance to be included in the employee's average weekly wage. The judgments of the court of appeals in *Ray v. Industrial Claim Appeals Office,* 124 P.3d 891 (Colo.App.2005); *Marsh v. Industrial Claim Appeals Office,* No. 04CA0911, 2005 WL 1837497 (Colo.App. Aug.4, 2005) (not selected for publication); and *Ashmore v. Industrial Claim Appeals Office,* No. 04CA1870, 2005 WL 1692850 (Colo.App. July 21, 2005) (not selected for publication), are affirmed. We also overrule *Midboe v. Industrial Claim Appeals Office,* 88 P.3d 643 (Colo.App.2003), to the extent that it is inconsistent with this opinion.

Justice COATS dissents.

Justice EID does not participate.

Justice COATS dissenting.

I disagree not only with the majority's conclusion in these particular cases, but also with its approach to statutory interpretation. I therefore respectfully dissent.

Rather than apply well-settled principles of statutory interpretation, I believe the majority becomes fixed on a broad declaration of legislative policy and dismisses as unreasonable any reading of specific statutory provisions that does not comport with the majority's own view of how best to implement that policy. I also believe the majority neglects its responsibility to independently construe the statute, instead reacting to the opinions of various court of appeals panels, in other cases, concerned with different issues altogether and lacking precedential value for this court in any event.

Despite the split in court of appeals thinking that led to this appeal, the majority declares section 8–40–201(19)(b), C.R.S. (2006), to be unambiguous, admitting of only one reasonable understanding. Maj. op. at 668–69. In terms of accepted principles of statutory construction, such a conclusion means, of course, that the statute has a "plain meaning," rendering unnecessary any further inquiry into legislative intent. See 2A Norman J. Singer, Statutes and Statutory Construction § 45:02 (6th ed.2000). Rarely will a particular word or sentence be capable of communicating an idea of any sophistication, between a sending and receiving party, without reference to some greater context or purpose. I consider the majority's reading of this statute to be not even the better, much less the only, reasonable understanding of the language chosen by the legislature to communicate its intent.

The majority focuses largely on the court of appeals' opinion in Midboe v. Industrial Claim Appeals Office, 88 P.3d 643 (Colo.App. 2003), criticizing its construction of the terms "continuing" and "conversion" as being direct references to Colorado's statutory scheme permitting terminated employees to continue and convert their previous employer's group health insurance plan. Maj. op. at 667. In Midboe, the court addressed the separate question of whether an employee's cost in continuing group health insurance, within the meaning of the statute, was intended to include any contribution by an employee to his group insurance coverage following a finding of his disability, or only the employee's cost in continuing coverage entirely at his own expense, after his employer had stopped contributing. Dismissing the intermediate appellate court's search for legislative intent as completely unnecessary, the majority simply declares the question expressly answered by the statute, which, in its view, admits of no alternative meanings. See maj. op. at 667–68.

In disparaging the suggestion of an intended cross-reference to COBRA, and therefore any legislative intent to require actual continuation and conversion of the employer's group health plan according to the terms of COBRA, however, the majority openly acknowledges that the word "cost" could have more than one meaning. In common parlance, it could refer to either the cost actually incurred by an employee in continuing his health insurance coverage or the price at which continued health insurance coverage is available to the employee, whether or not he chooses to take it. Maj. op. at 668. Although the two meanings are clearly incompatible, the majority considers the statutory language itself broad enough to include both, but in the absence of some additional limitation to the former, the "plain language" of the statute unambiguously means the latter. Id.

On the contrary, had the legislature intended the term "employee's cost" to mean the cost that an employee would incur, if he were to continue his health insurance, it could much more precisely have expressed that intent with a conditional sentence, or by using a subjunctive verb form, or simply by referring to price rather than cost. Accepting, however, that the terms "price" and "cost" are often used interchangeably and that reasonable minds could understand the legislature to have tacitly assumed by "cost," the "price" at which health insurance would be made available to the employee, the effect would be an ambiguity in meaning, to be

resolved by other aids to interpretation. *See generally* 2A Singer, *supra* § 45:05.

Apparently recognizing the tenuousness of its explanation, the majority offers, in the alternative, that even if the legislature's use of the term "cost" were considered ambiguous, nothing in the legislative history of this provision, which admittedly does not address the matter at all, would support *Midboe's* perceived linkage with COBRA. *See* maj. op. at 669. Such an approach literally stands the judicial resolution of ambiguous legislative enactments on its head, not only presuming a particular intent from a lack of any specific historical reference to the contrary, but ignoring other important indicators of legislative intent, like context within a larger statutory scheme, the nature and timing of statutory changes relative to existing provisions and external events, and public policy concerns likely motivating specific legislative choices.

Apart from the chosen language itself, however, the legislature's unique treatment of health insurance benefits points to an actual, rather than contingent, employee expense. In the 1989 amendments at issue here, the general assembly completely eliminated the catch-all provision for "other similar advantages" and allowed in the calculation of an employee's average weekly wage only those advantages or fringe benefits enumerated in the statute. *See* maj. op. at 664 (citing ch. 67, sec. 4, § 8–47–101(2), 1989 Colo. Sess. Laws 409, 411). Along with the reasonable value of room and board, the statute included as an advantage or fringe benefit "the cost of health insurance coverage or the cost of the conversion of such health insurance coverage;" but unlike the amount an employer had been paying for room and board, it mandated that the amount an employer had been contributing to health insurance not to be included in the calculation of average weekly wage. *Id.* Instead, the legislature substituted for that figure the employee's cost of continuing the employer's group health insurance plan, and upon termination of the continuation, the employee's cost of conversion to a similar or lesser plan. *Id.* Because employers' health insurance plans may, and typically do, require that a portion of the purchase price,

over and above the employer's share, be paid by the employee himself, this formula actually includes an increase in the average weekly wage beyond the benefit previously provided by the employer. *Id.*

An employer's contribution for health insurance differs from the reasonable value of room and board in that it is paid, and treated as a fringe benefit, only if the employee chooses to invest in his own health insurance by incurring additional costs himself. In the absence of his willingness to incur that expense, the employee may not be entitled to receive any health benefit from the employer. By permitting disabled employees to include their full cost of continuing and converting their health insurance, *as if* it were a component of the rate at which their services were recompensed under their contract of hire, the legislature has unquestionably provided an incentive for them to continue health insurance coverage for themselves and their dependents. Furthermore, because an employee's disability benefit consists of only a percentage of his average weekly wage (according to the majority, two-thirds in the case of someone situated similarly to Ray, maj. op. at 664), with this formula the legislature has also maintained approximately the same relative obligations of employer and employee in continuing the employee's health insurance coverage. Even without an express declaration of intent, the rationale for this formula is apparent.

Furthermore, by emphatically rejecting the court of appeals' pre–1989 treatment of health insurance as "any other similar advantage[ ]," the "reasonable value" of which was to be added to the employee's average weekly wage as a fringe benefit, and instead specifically defining the "benefit" as the "employee's cost of continuing the employer's group health insurance plan," the general assembly demonstrates a clear intention to eliminate judicial discretion in the matter and make the benefit a determinable amount. § 8–40–201(19). The legislature could therefore have meant "price" by referring to "cost" only if the price of continuing and converting the employer's group health insurance program were a determinable amount. Because section 8–40–201(19)(b)

permits continuation and conversion to a "similar or lesser insurance" plan, as the majority notes, *see* maj. op. at 669, the cost to the employee of continuing or converting health insurance cannot be precisely known unless, and until, the employee actually purchases a particular plan.

Understanding the statute, as the majority does, to treat the cost of continuing health insurance as a fringe benefit, even though the employee chooses not to use the increase in his disability benefit for that purpose, deprives this carefully worked-out formula of any significance; gives employees who had accepted coverage before being injured a meaningless windfall over those who had not; and emasculates the public policy interest in providing an incentive for injured workers to continue their health coverage. While the potential hardships of transactional delay are realities of virtually any legal proceeding, the majority cannot suggest that delay is increased by requiring actual continuation of health coverage, or that increasing benefits for the employee despite his failure to continue health coverage better serves the employee's health care needs. It merely points to the fact that for some employees, even this option may not provide a meaningful incentive.

To my mind, the majority's interpretation does little more than increase the disability checks of certain injured employees, by an amount that is unrelated to the money rate at which their services were recompensed before their disability, while ignoring appropriate considerations of continuity, symmetry, and public policy in the determination of legislative intent. I therefore respectfully dissent.