2013 COA 48

**UNITED AIRLINES, Petitioner,**

v.

**INDUSTRIAL CLAIM APPEALS OFFICE OF THE STATE OF COLORADO and Angela Jones, Respondents.**

**Court of Appeals No. 12CA1443**

Colorado Court of Appeals,
Div. IV.

Announced March 28, 2013

---

Ritsema & Lyon, P.C., Lynn P. Lyon, Michael M. Maglieri, Denver, Colorado, for Petitioner.

No Appearance for Respondent Industrial Claim Appeals Office.

Alvarado, LaForett & Martinez Tenreiro, LLC, Elsa Martinez Tenreiro, Denver, Colorado, for Respondent Angela Jones.

Opinion by JUDGE WEBB

¶ 1 In this workers' compensation action, self-insured employer, United Airlines (employer), seeks review of a final order of the Industrial Claim Appeals Office (Panel), affirming the order of an administrative law judge (ALJ) that denied employer's request for reimbursement of temporary total disability (TTD) benefits in excess of the $75,000 statutory cap. We conclude that the cap does not apply to benefits paid before a worker reaches maximum medical improvement (MMI) or is released to work. Therefore, we affirm.

## I. Background

¶ 2 All dispositive facts are undisputed. After claimant, Angela Jones, sustained a compensable injury in 2007, employer admitted liability for TTD benefits. Claimant's TTD benefits ceased when she was released to return to work in May 2011, by which time she had been paid $99,483.14. Shortly thereafter, a physician performed a division-sponsored independent medical examination and placed claimant at MMI with a permanent impairment of five percent of the whole person.

¶ 3 Relying on section 8–42–107.5, C.R.S. 2012, which caps combined TTD and permanent disability benefits at $75,000 for a claimant whose impairment rating is twenty-five percent or less of the whole person, employer sought to recover the $24,483.14 it had paid in excess of the cap as an overpayment. Claimant responded that she had not received an overpayment because under section 8–42–105(3), C.R.S.2012, employer was required to continue paying TTD benefits until she was released to work.

¶ 4 The ALJ concluded that the cap did not apply so long as claimant was entitled to receive TTD benefits. Consequently, because claimant had not received an overpayment, she was not required to repay employer the amount she had received above the cap. The Panel agreed.

## II. Law

¶ 5 This case presents only an issue of statutory interpretation.

### A. Scope of Review

¶ 6 If a provision of the Workers' Compensation Act (Act) is clear, "we interpret the statute according to its plain and ordinary

meaning." *Davison v. Indus. Claim Appeals Office*, 84 P.3d 1023, 1029 (Colo.2004). In addition, "when examining a statute's plain language, we give effect to every word and render none superfluous ... because '[w]e do not presume that the legislature used language idly and with no intent that meaning should be given to its language.'" *Colo. Water Conservation Bd. v. Upper Gunnison River Water Conservancy Dist.*, 109 P.3d 585, 597 (Colo.2005) (quoting *Carlson v. Ferris*, 85 P.3d 504, 509 (Colo.2003)).

¶ 7 This court is not bound by the Panel's interpretation, *Olivas–Soto v. Indus. Claim Appeals Office*, 143 P.3d 1178, 1180 (Colo.App.2006), and we review statutory construction de novo. *Ray v. Indus. Claim Appeals Office*, 124 P.3d 891, 893 (Colo.App. 2005), *aff'd*, 145 P.3d 661 (Colo.2006). However, we give deference to the Panel's reasonable interpretations of the statute it administers. *Sanco Indus. v. Stefanski*, 147 P.3d 5, 8 (Colo.2006); *Dillard v. Indus. Claim Appeals Office*, 121 P.3d 301, 304 (Colo.App.2005), *aff'd*, 134 P.3d 407 (Colo. 2006). Thus, the Panel's interpretation will be set aside only "if it is inconsistent with the clear language of the statute or with the legislative intent." *Support, Inc. v. Indus. Claim Appeals Office*, 968 P.2d 174, 175 (Colo.App.1998).

### B. Relevant Provisions of the Act

¶ 8 The Act limits the total disability benefits that a claimant whose permanent impairment rating is less than twenty-six percent may receive:

No claimant whose impairment rating is twenty-five percent or less may receive more than seventy-five thousand dollars from combined temporary disability payments and permanent partial disability payments.

§ 8–42–107.5.

¶ 9 The Act does not provide that a claimant's benefits cease when that ceiling is reached. To the contrary, it specifies that benefits must continue until one of the following conditions is met:

(3) Temporary total disability benefits shall continue until the first occurrence of any one of the following:

(a) The employee reaches maximum medical improvement;

(b) The employee returns to regular or modified employment;

(c) The attending physician gives the employee a written release to return to regular employment; or

(d)(I) The attending physician gives the employee a written release to return to modified employment, such employment is offered to the employee in writing, and the employee fails to begin such employment.

§ 8–42–105(3).

¶ 10 Under the Act:

"Overpayment" means money received by a claimant that exceeds the amount that should have been paid, or which the claimant was not entitled to receive, or which results in duplicate benefits because of offsets that reduce disability or death benefits payable under said articles. For an overpayment to result, it is not necessary that the overpayment exist at the time the claimant received disability or death benefits under said articles.

§ 8–40–201(15.5), C.R.S.2012.

### III. Applicability of the Cap

¶ 11 Employer first contends the ALJ misinterpreted the Act in concluding that claimant had not been overpaid. Employer concedes that the Act does not permit discontinuing TTD benefits before one of the conditions in section 8–42–105(3) is met, but argues that to avoid a conflict with the cap, benefits paid in excess of the cap still must be repaid once the claimant's entitlement to TTD benefits has ended. We consider these arguments separately and reject them both.

### A. Claimant Did Not Receive an Overpayment of Benefits

¶ 12 Although claimant received benefits exceeding the cap, the circumstances do not satisfy other elements of the definition of overpayment. The relevant phrase—"money received"—limits overpayment to sums ex-

ceeding "the amount that *should have been paid.*" § 8–40–201(15.5) (emphasis added). Here, because claimant received only benefits to which she was entitled, the $24,483.14 she received above the cap did not constitute an overpayment. *See Cooper v. Indus. Claim Appeals Office,* 109 P.3d 1056, 1059 (Colo.App.2005) (once authorized lump sum had been paid as "required by statute ... it 'became a vested right' " (quoting *McBride v. Indus. Comm'n,* 97 Colo. 166, 172, 49 P.2d 386, 389 (1935))); *Rocky Mountain Cardiology v. Indus. Claim Appeals Office,* 94 P.3d 1182, 1186 (Colo.App.2004) (because temporary disability was owing as a matter of law until ALJ granted prospective relief, disputed payment did not constitute overpayment).

¶ 13 This interpretation is consistent with the absence of any reference to the cap among the conditions that terminate TTD benefits under section 8–42–105(3). *See Henderson v. City of Fort Morgan,* 277 P.3d 853, 855 (Colo.App.2011) ("Had the legislature intended to prescribe a voting procedure ... it could have said so plainly."); *see also Bd. of Educ. v. Spurlin,* 141 Colo. 508, 522, 349 P.2d 357, 364 (1960) ("the express mention of a person or thing ... impliedly excludes other persons or things not mentioned"). It is also consistent with the absence of a cross-reference in section 8–42–107.5 to section 8–42–105(3). *See Nededog v. Colo. Dep't of Health Care Policy & Fin.,* 98 P.3d 960, 964 (Colo.App.2004) (noting absence of cross-reference).

¶ 14 In addition, section 8–42–107.5 caps "combined" temporary and permanent payments at $75,000. The legislature's use of "combined" suggests that, to reach the cap, a claimant must have received both temporary and permanent benefits. Here, the benefits claimant received were solely for her temporary disability; because she exceeded the cap before an award of permanent benefits was made, none of the benefits paid to her was compensation for permanent impairment. Thus, she never received combined permanent and temporary benefits exceeding the cap.

¶ 15 Employer's citation of *Donald B. Murphy Contractors, Inc. v. Industrial Claim Appeals Office,* 916 P.2d 611 (Colo.

App.1995), and *Rogan v. Industrial Claim Appeals Office,* 91 P.3d 414 (Colo.App.2003), does not require a different outcome. In *Donald B. Murphy,* the employer was permitted to offset permanent partial disability (PPD) benefits that had already been paid to the claimant, up to the statutory cap, against TTD benefits that he might receive after his claim was reopened. Similarly, in *Rogan,* the claimant was denied additional TTD benefits because he had already received both TTD and PPD benefits. Thus, unlike the pending case, each claimant's combined PPD and TTD benefits had reached the cap when the claimant sought additional TTD benefits. Neither case addresses whether the claimants would be entitled to additional TTD benefits if, as here, those benefits, when calculated exclusive of their permanent benefits, reached the statutory cap.

### B. Claimant Need Not Repay Benefits Exceeding the Cap

¶ 16 Urging that a conflict can be avoided between section 8–42–105(3) and the cap by requiring repayment of excess benefits, employer points out that, if the legislature had intended to permit claimants to keep payments in excess of the cap, it would have said so in the Act. Even if this argument is not precluded by the foregoing interpretation of section 8–42–105(3), it also fails for the following three reasons.

¶ 17 First, although the legislature did not include a provision expressly allowing claimants who receive TTD benefits of more than $75,000 to keep the excess, it also did not specify that such benefits must be repaid. Nor did it list the repayment sought by employer among the types of recoverable overpayments addressed in section 8–42–113.5, C.R.S. 2012. We decline to read such a provision into the Act. *See Kraus v. Artcraft Sign Co.,* 710 P.2d 480, 482 (Colo.1985) ("We have uniformly held that a court should not read nonexistent provisions into the ... Act.").

¶ 18 Second, the mandate that TTD benefits continue until one of several conditions is satisfied uses language ("shall") stronger than the wording of section 8–42–107.5: "no claimant" whose impairment rating is less

than twenty six percent "may receive" combined permanent and temporary benefits in excess of $75,000. *Cf. Danielson v. Castle Meadows, Inc.,* 791 P.2d 1106, 1113 (Colo. 1990) (unless legislative purpose requires otherwise, "may" is permissive and "shall" is mandatory).

¶ 19 Third, divisions of this court have held that the cap cannot be applied until a claimant has reached MMI or is released to work. *Donald B. Murphy,* 916 P.2d at 613 ("Therefore, only after (1) the claimant reaches maximum medical improvement and (2) his medical impairment rating is established can the applicability of [section] 8–42–107.5 be determined."); *Rogan,* 91 P.3d at 415 ("[T]he cap established by [section] 8–42–107.5 cannot take effect before a claimant attains MMI."). While so delaying application of the cap may, as here, result in payments exceeding the cap, "we have no authority to remedy that problem." *Leprino Foods Co. v. Indus. Claim Appeals Office,* 134 P.3d 475, 480 (Colo.App.2005).

¶ 20 Since *Donald B. Murphy Contractors* was decided, the General Assembly has not changed the relevant language, despite having amended the statute in 2005, 2009, and 2010.[1] Presumably, the General Assembly was aware of the problem but chose not to remedy it. *See Vigil v. Franklin,* 103 P.3d 322, 327 (Colo.2004) ("[W]hen it chooses to legislate in a particular area, the General Assembly is presumed to be aware of existing case law precedent."). Therefore, it remains "clear that the General Assembly intended to require employers to continue paying benefits without application of the cap until such time as a claimant reaches MMI." *Leprino Foods,* 134 P.3d at 480.

### C. Public Policy Does Not Require a Different Interpretation

■ ¶ 21 Employer's assertion that the interpretation by the ALJ and the Panel affords claimants who receive benefits in excess of the cap a windfall in violation of public policy, which also creates "an incentive for injured workers to delay their recovery," is unpersuasive.

¶ 22 Employer has not cited a Colorado case, nor have we found one, in which a statutory interpretation based on plain language in the Act has been rejected as against public policy. In any event, we are not persuaded that the scenarios described by employer either create a windfall or encourage malingering.

¶ 23 Claimant only received benefits to which she was entitled for the temporary period when she was unable to work. Requiring her to repay some of those benefits could adversely affect her financial independence, thereby eroding the beneficent purpose of the Act. *See Davison,* 84 P.3d at 1029 (the Act "is intended to be 'remedial and beneficent in purpose,' and should be liberally construed' in order to accomplish these goals" (quoting *Colo. Counties, Inc. v. Davis,* 801 P.2d 10, 11 (Colo.App.1990), *aff'd sub nom. Cnty. Workers Comp. Pool v. Davis,* 817 P.2d 521 (Colo.1991))).

¶ 24 Because, in most circumstances, employers select the physicians who release employees to work and determine MMI, employees on temporary disability status have little opportunity to malinger. And any risk of malingering is counterbalanced by the long-term health consequences to an employee who returns to work prematurely because of the risk of an overpayment claim. Such competing public policy considerations should be resolved by the legislature. *See, e.g., Town of Telluride v. Lot Thirty–Four Venture, L.L.C.,* 3 P.3d 30, 38 (Colo.2000) ("It is not up to the court to make policy or to weigh policy.").

¶ 25 In sum, we conclude that claimant did not receive an overpayment and the cap does not obligate her to repay employer for benefits to which she was entitled.

### IV. Equal Protection

¶ 26 Employer's contention that construing these statutes to permit claimant to keep more than $75,000 in TTD benefits violates equal protection is also unpersuasive.

1. *See* Ch. 323, sec. 1, § 8–42–107.5, 2005 Colo. Sess. Laws 1505; Ch. 269, sec. 4, § 8–42–107.5, 2009 Colo. Sess. Laws 1223; Ch. 310, sec. 7, § 8–42–107.5, 2010 Colo. Sess. Laws 1459.

## A. The Constitutional Issue is Preserved

¶ 27 Most cases hold that because neither an ALJ nor the Panel is authorized to address constitutional challenges to the Act, such challenges can be raised for the first time on appeal. *See, e.g., Indus. Comm'n v. Bd. of Cnty. Comm'rs*, 690 P.2d 839, 844 n . 6 (Colo.1984) ("[I]t is doubtful that the Commission has authority to decide constitutional questions. Therefore, these issues must be raised for the first time on appeal to the court of appeals."); *Montezuma Well Serv., Inc. v. Indus. Claim Appeals Office*, 928 P.2d 796, 798 (Colo.App.1996) ("[T]he fact that petitioners did not raise [the constitutional issue] before the ALJ and Panel does not preclude them from raising the issue here.").

¶ 28 Nevertheless, claimant asserts that employer's equal protection challenge is unpreserved because the challenge is as applied, rather than facial, and employer failed to raise it before either the ALJ or the Panel. *Williams v. Indus. Claim Appeals Office*, 128 P.3d 335, 339 (Colo.App.2006), *rev'd sub nom. Williams v. Kunau*, 147 P.3d 33 (Colo.2006), supports this as applied distinction.[2]

¶ 29 We decline to apply *Williams* because the case on which it relied, *Horrell v. Dep't of Admin.*, 861 P.2d 1194, 1198–99 (Colo.1993), is less definitive on whether an administrative agency may consider an as applied challenge, nor does *Horrell* say that the agency must consider the as applied challenge for the issue to be preserved. Instead, *Horrell* distinguished the facial challenge before it from an earlier "similar claim" presented to the State Personnel Board on the grounds that the prior case "raised issues that were independent from the constitutional concerns." *Id.* at 1199 (citing *Colo. Ass'n of Pub. Emp. v. Dep't of Highways*, 809 P.2d 988 (Colo.1991)). But here, unlike in *Williams*, the undisputed facts left no need for the ALJ to make factual determinations that may inform an as applied challenge.[3]

¶ 30 Moreover, as the division explained in *Pepper v. Indus. Claim Appeals Office*, 131 P.3d 1137, 1139 (Colo.App.2005), *aff'd on other grounds sub nom. City of Florence v. Pepper*, 145 P.3d 654 (Colo.2006):

> The distinction between a "facial" and an "as applied" equal protection challenge is not always clear cut. A facial challenge is supported where the law by its own terms classifies persons for different treatment. In contrast, a statute, even if facially benign, may be unconstitutional as applied where it is shown that the governmental officials who administer the law apply it with different degrees of severity to different groups of persons who are described by some suspect trait.

*See also W. Metal Lath v. Acoustical & Constr. Supply, Inc.*, 851 P.2d 875, 880 n. 7 (Colo.1993) (a classification "on its face" means that the law "by its own terms classifies persons for different treatment," while in "application" cases the law "either shows no classification on its face or else indicates a classification which seems to be legitimate, but those challenging the legislation claim that the governmental officials who administer the law are applying it with different degrees of severity to different groups of persons" (quoting John E. Nowak et al., *Constitutional Law* 600 (2d ed. 1983))).

¶ 31 Here, the statutory requirement that TTD benefits continue without reference to the cap identifies a class of claimants whose benefits may exceed the cap before the benefits cease upon one of the enumerated conditions. Employer does not assert a classification arising solely from the conduct of the ALJ and the Panel. Hence, employer presents a facial challenge that need not have been raised below.

---

2. In reversing *Williams*, the supreme court did not address the distinction between as applied and facial challenges.

3. *Compare Malecon Tobacco, LLC v. State*, 118 Nev. 837, 59 P.3d 474, 477 (2002) (requiring exhaustion of administrative remedies where as applied challenge involved factual evaluation), *with Mem'l Hosp. v. Dep't of Revenue*, 770 P.2d 223, 226 (Wyo.1989) (no need to exhaust administrative remedies where parties stipulated to facts relevant to as applied equal protection challenge).

## B. The Statute Does Not Deny Equal Protection

¶ 32 Equal protection guarantees that similarly situated persons will receive like treatment under the law. *Harris v. The Ark,* 810 P.2d 226, 229 (Colo.1991). Where, as here, the challenged statute does not affect a fundamental right or adversely impact a suspect class, a "traditional or rational basis standard of review" applies. *Id.* at 230. Under this test, "a statute that treats classes of persons differently will be upheld so long as the classification has a reasonable basis in fact—that is, the classification is based on differences that are real and not illusory—and is reasonably related to a legitimate governmental interest." *Id.* Such a statute "does not violate the equal protection guarantee because its classifications are imperfect." *Buckley Powder Co. v. State,* 70 P.3d 547, 562 (Colo.App.2002).

¶ 33 Employer asserts that failing to require claimants who have received TTD benefits exceeding the cap to repay the excess after their benefits cease creates two classes of claimants under section 8–42–105(3): those whose benefits will be capped because their benefits had not exceeded the cap when they reached MMI or were released to work, and those whose benefits exceeded the cap before they reached MMI or were released to work. While this characterization reflects the Panel's interpretation, employer's argument that this disparity violates equal protection fails, for two reasons.

¶ 34 First, the two classes that employer identifies are not similarly situated. Even if two claimants suffer comparable injuries, they will not necessarily recover at the same rate. Hence, one such claimant's TTD benefits may exceed the statutory cap because that claimant took longer to attain MMI or be released to work. Such a claimant would need income until he or she was well enough to return to work. Thus, the outcome is different because the classes are different: a claimant who has attained MMI or been released to work before TTD benefits reached the cap may not need further economic assistance, and thus would be subject to the cap.

¶ 35 Second, even if both classes of claimants are similarly situated, requiring a claimant to pay back benefits to which the claimant was entitled—and presumably needed—could create a hardship at odds with the beneficent purpose of the Act. Also, proceedings by employers to recover excess payments could burden the administrative process, contrary to the Act's objective of creating an efficient system for distributing benefits. These considerations rationally justify the resulting difference in treatment. *Cf. Bellendir v. Kezer,* 648 P.2d 645, 647 (Colo.1982) ("An expeditious method of compensating disabled workers is a legitimate governmental objective . . . to which the formula of fixed awards for permanent disability is rationally related. Therefore, we conclude that the compensation formula violates neither due process nor equal protection.").

¶ 36 Accordingly, we conclude that the operation of section 8–42–105(3) in conjunction with section 8–42–107.5 does not violate equal protection.

¶ 37 The order is affirmed.

JUDGE LICHTENSTEIN and JUDGE FOX concur.