Judge CARPARELLI dissenting.
We all have deep respect and appreciation for firefighters, their knowledge and skills, and the dangers they endure in service to *454 others. Among these dangers is uncontrolled exposure to chemical substances.
The employer contends that the administrative law judge's (ALJ's) June 2009 order was supported by substantial evidence and that the Panel erred when it reversed the order in November 2009. I agree.
I disagree with the majority opinion's conclusion that the ALJ's findings are not supported by sufficient evidence. We are required to consider the evidence as a whole and in the light most favorable to the party that prevailed before the ALJ, and defer to the ALJ's determinations of the credibility and resolution of conflicting evidence. Metro Moving & Storage Co. v. Gussert, 914 P.2d 411, 415 (Colo.App.1995). In my view, the majority opinion's final analysis considers the evidence in the light most damaging to the prevailing party, impermissibly makes inferences damaging to the prevailing party, and impermissibly makes its own resolution of conflicting evidence.
There are two essential issues in this case:
• What is the employer's burden of proof?
• Is there sufficient evidence to support the ALJ's June 2009 determination that the employer met that burden?
To answer the first question, I begin with the words of the statute and an analysis that leads to plain statements of the presumption and the burden to overcome it. Although I arrive at statements of the presumption and burden that are similar to those of the majority opinion, I use a different analytic framework that parties and ALJs may find useful in future cases. I also address aspects of the majority opinion's analysis with which I disagree, and others that might be misunderstood and misapplied.
I conclude that, for qualifying firefighters who have cancer of a listed organ or system, section 8-41-209(2)(a), C.R.S.2012, creates a presumption that the firefighter's particular cancer resulted from, arose out of, or was sustained in the course of his or her employment.
For purposes of proof, this means that ALJs must presume that a firefighter's employment was capable of causing the firefighter's specific cancer, and that the firefighter's employment did cause that cancer. To overcome this presumption, an employer must prove that it is more likely that the firefighter's employment was not capable of causing the firefighter's specific cancer, or if the ALJ finds that the employment was capable of causing the cancer, that it is, nonetheless, more likely that the firefighter's employment did not cause that cancer.
I then review the evidence presented here and conclude that there is sufficient evidence to support the ALJ's findings. Therefore, I conclude that the Panel erred when it reversed the ALJ's June 2009 order.
I. The Employer's Burden of Proof
A. The Workers' Compensation Act
Article 41 of title 8 of the Workers' Compensation Act of Colorado (the Act) controls workers' compensation coverage and liability. See § 8-40-102, C.R.S.2012.
To receive workers' compensation benefits, a worker must first show that he or she has an injury or occupational disease that arises out of his or her employment and was sustained in the course of that employment. § 8-41-301(1)(c), C.R.S.2012.
B. Occupational Disease Criteria for High Tenure Firefighters
Section 8-41-209(1), C.R.S.2012, enables certain firefighters to prove that their cancers of the brain, skin, digestive system, hematological system, or genitourinary system constitute "occupational diseases," and, thus, to satisfy one condition of recovery under section 8-41-301. § 8-41-209(1).
To qualify under section 8-41-209(1), a firefighter must have completed five or more years of employment as a firefighter (high tenure firefighter). When a high tenure firefighter has died, has become disabled, or has a health impairment, and it is proved that the death, disability, or impairment was caused by a cancer of one of the qualifying organs or systems, the firefighter's cancer is considered "an occupational disease" if the firefighter can prove that the cancer"result[ed] from his or her employment as a firefighter." § 8-41-209(1) (emphasis added).
*455 C. The "Resulting-From" Presumption
However, some firefighters are relieved of the burden of proving that their cancers resulted from their employment as firefighters. Any firefighter, regardless of tenure, who proves that, upon or after becoming a firefighter, he or she had a physical examination that found no substantial evidence of a pre-existing cancer of a qualifying organ or system, is afforded a presumption, and relieved of the burden of proving, that his or her cancer"resulted from his or her employment as a firefighter" (the resulting-from presumption). § 8-41-209(2)(a), C.R.S.2012. The presumption satisfies the section 8-41-301(1)(c) condition that, to be compensable, an occupational disease must "aris[e] out of and in the course of [the worker's] employment." Accordingly, the presumption is that the firefighter's cancer resulted from, arose out of, or was sustained in the course of the firefighter's employment.
I agree with the majority opinion that when evaluating toxic tort causation, courts have considered both general and specific causation. To prove general causation, a plaintiff must prove that the alleged substance is capable of causing the illness. Steve C. Gold, The "Reshapement" of the False Negative Asymmetry in Toxic Tort Causation, 37 Wm. Mitchell L.Rev. 1507, 1512, 1563-65 (2011). In addition, a plaintiff must prove that the alleged substance did, in fact, cause his or her illness, that is, specific causation. Id. However, I disagree with the Panel's conclusion that the resulting-from presumption includes a conclusive presumption of general causation.
Section 8-41-209(2)(a) creates a presumption that a firefighter's qualifying cancer resulted from, arose out of, or was sustained in the course of his or her employment. For purposes of proof, this means that it must be presumed (1) that the firefighter's employment was capable of causing the firefighter's particular cancer of the brain, skin, digestive system, hematological system, or genitourinary system; and (2) that the firefighter's employment caused the specific cancer he or she suffers.
The statute refers to organs and human physiological systems that become cancerous. In a given case, the presumption is that the specific cancer of the affected organ or system resulted from the firefighter's employment, not that all cancers of the organ or system result from employment as a firefighter. Thus, the scope of the employer's burden is limited to the claimant firefighter's specific type of cancer.
D. Rebutting the "Resulting-From" Presumption
According to section 8-41-209(2)(b), C.R.S.2012, the resulting-from presumption is rebutted "if the firefighter's employer or insurer shows by a preponderance of the medical evidence that such condition or impairment did not occur on the job. " (Emphasis added.)
Unfortunately, the phrase "occur on the job" is not a term that appears in the Act other than in sections 8-41-208 and -209. Moreover, only one Colorado state appellate court opinion has used this phrase. See Smartt v. Lamar Oil Co., 623 P.2d 73, 75 (Colo.App.1980). In that case, the division cited an earlier case that used the phrase "job-related injuries. " See Frohlick Crane Service, Inc. v. Mack, 182 Colo. 34, 37-38, 510 P.2d 891, 892-93 (1973) (emphasis added).
We must determine the meaning of the phrase "did not occur on the job" in a manner that is consistent and harmonious with related provisions of the Act, including the recovery conditions of section 8-41-301(1)(c) and the presumption in section 8-41-209(2)(a). See Farmers Reservoir & Irrigation Co. v. City of Golden, 113 P.3d 119, 130 (Colo.2005) ; Colo. Water Conservation Bd. v. Upper Gunnison River Water Conservancy Dist., 109 P.3d 585, 593 (Colo.2005) ; Bd. of County Comm'rs v. Costilla County Conservancy Dist., 88 P.3d 1188, 1192-93 (Colo.2004).
Doing so, I conclude that section 8-41-209(1) is not ambiguous. To rebut the resulting-from presumption, the employer must prove, by a preponderance of the evidence, that the qualifying cancer did not result from, did not arise out of, or was not *456 sustained in the course of, the firefighter's employment.[13]
Here this means the employer was required to prove that it is more likely that the firefighter's employment was not capable of causing his GBM; or if his employment was capable of causing GBM, that it is, nonetheless, more likely that the firefighter's employment did not cause his GBM. It is this standard that the ALJ was required to apply, and it is by this standard that we must determine whether there is sufficient evidence to support the ALJ's findings.
E. Meeting the Burden
1. Epidemiologic Evidence of General Causation
The majority opinion acknowledges that "[c]ourts regard epidemiology as the best evidence of general causation." That is, it is the best evidence that a substance is capable of causing a particular illness. However, the majority opinion later quotes a statement by Professor Gold, see 37 Wm. Mitchell L.Rev. at 1520, and, from that quote, concludes that "[t]hus, by its nature, epidemiology is not highly probative on the issue of specific causation. It is of limited value in rebutting a presumption that a particular claimant contracted his particular disease as the result of an unspecified workplace exposure." I disagree.
In the same article, Professor Gold says that "some evidence of general causation is a prerequisite to proof of specific causation." Id. at 1563. He also says that in many cases, if not the great majority of cases, courts require that both general and specific causation be proved. Id. at 1565. Thus, the absence of general causation forecloses the possibility of specific causation. It is in this way that a thorough, well-designed, and well-executed epidemiologic search for environmental factors capable of causing a specific cancer can eliminate some factors as actual causes, and, thereby, narrow the task of determining whether a firefighter's particular cancer resulted from something in his employment.
The majority opinion also refers to Gerald W. Boston, A Mass-Exposure Model of Toxic Causation: The Content of Scientific Proof and the Regulatory Experience, 18 Colum. J. Envtl. L. 181 (1993). In that article, immediately after the discussion of relative risk that the majority opinion quotes, Professor Boston says that "[t]o determine if an association is causal, epidemiologists have developed criteria that treat the statistical association as the starting point of the analysis," but "associational data alone do not permit biological inferences." Id. at 237. Consequently, scientists apply "more particularistic, analytical and biological tests before reaching a conclusion respecting a causal relationship." Id. Professor Boston explains that biological plausibility is among the criteria that appear to have achieved a high level of acceptability and utility with regard to determining causation. Id. at 238.
Thus, once again, epidemiology is highly probative because it considers human physiology and the likelihood that a potential environmental factor is capable of entering the body, traveling to a particular organ, and interacting with that organ in a way that can cause a particular cancer.
Although the majority opinion says that the presumption "contemplates a wide range of biological mechanisms," it does not appear to recognize the probative value of evidence about the extent to which biological mechanisms increase or decrease the likelihood that a chemical could cause a particular cancer.
2. Specific Causation
I agree with the majority opinion's statement that the presumption is that the firefighter's qualifying cancersomehow resulted from his or her employment and that the presumption is broad. However, in my view, *457 the majority opinion's further description of the breadth of the presumption tends to confuse rather than clarify because it implies that the employer has the burden of eliminating all imaginable possibilities. In so doing, it renders reasonable inferences impermissible and section 8-41-209(2)(b) meaningless.
With regard to the probative value of scientific evidence, the majority opinion says the employer cannot challenge "the wisdom or evidentiary foundation of the legislature's [valid policy] decision." This statement is susceptible of broad interpretation and, if not explained, could erroneously undermine the admissibility of probative evidence.
To the extent that the majority opinion's comment about not challenging the wisdom or evidentiary basis means that employers may not challenge the statute as unfair or unreasonable, I agree. I also agree to the extent that it means that the ALJ must afford the presumption to qualifying firefighters. There is no basis upon which the ALJ could properly decide that the General Assembly's decision to create the presumption was a bad one and should not be applied. Here, the ALJ appropriately applied the presumption.
Nonetheless, it is not clear what the majority opinion means by the "evidentiary foundation" of the legislature's policy decision. It implies that the General Assembly decided that there is scientific proof that cancers of the brain, skin, digestive system, hematological system, or genitourinary system result from firefighting. However, the statute contains no such statement.
All that can be said accurately is that the General Assembly heard complicated scientific testimony supporting both sides of the issue. It also heard testimony that it is difficult and expensive for firefighters to prove causation, and that, as a result, few firefighters submit claims. After hearing this testimony, the General Assembly granted an evidentiary presumption of causation to certain firefighters, shifted the burden to employers, and left it to ALJs to determine causation on a case-by-case basis.
There is no basis to conclude that the General Assembly was presented with an evidentiary foundation supporting a conclusion that all variations of cancer of the listed organs result from employment as a firefighter. Nor is there any basis to conclude that the majority of legislators who voted in favor of the presumption did so because they were persuaded that all variations of cancers of those organs and systems result from employment as a firefighter. The testimony in the General Assembly was neither that specific nor that complete.
ALJs should apply the majority opinion's comment about challenging the wisdom or evidentiary foundation to mean that the firefighter must be afforded the presumption and that employers cannot be permitted to argue that the General Assembly did not have a sufficient basis to create it. ALJs should not apply the comment to disallow or give less weight to scientific evidence that tends to prove that a particular firefighter's employment was not capable of causing his or her cancer or that, even if it was capable of doing so, it did not do so.
II. Sufficiency of the Evidence
The presumption is that the firefighter's employment was capable of causing and did cause his GBM. The employer's burden is to prove that it is more likely that the firefighter's employment was not capable of causing his GBM, or that, if it was capable of causing the GBM, it did not cause it in this firefighter. Applying that presumption here, I conclude there was sufficient evidence to support the ALJ's findings.
A. Standard of Review
"If the findings of fact entered by the director or administrative law judge are supported by substantial evidence, they shall not be altered by the court of appeals." § 8-43-308, C.R.S.2012; cf. § 8-43-301(8), C.R.S.2012 (same standard applies to panel's review of ALJ's order). "Substantial evidence is that quantum of probative evidence which a rational fact-finder would accept as adequate to support a conclusion, without regard to the existence of conflicting evidence." Metro Moving & Storage Co. 914 P.2d at 414. When applying this standard, we consider the evidence as a whole and in the light most *458 favorable to the prevailing party, and defer to the ALJ's determinations of credibility and resolution of conflicting evidence. Id. at 415. Accordingly, "we may not interfere with the ALJ's credibility determinations except in the extreme circumstance where the evidence credited is so overwhelmingly rebutted by hard, certain evidence that the ALJ would err as a matter of law in crediting it." Arenas v. Indus. Claim Appeals Office, 8 P.3d 558, 561 (Colo.App.2000).
The majority opinion's final analysis does not adhere to this standard.
B. ALJ's Findings
The ALJ found that:
• the employer's expert witnesses' opinions were clear, reliable, and well-founded based on scientific evidence;
• the data analysis upon which the firefighter's experts relied did not support their opinions regarding causation;
• the firefighter's witnesses demonstrated bias, were not reliable, and did not credibly rebut the employer's evidence;
• the substances to which the firefighter was exposed did not target his brain;
• the substances to which the firefighter was exposed do not cause brain cancer ; and
• the employer proved, by a preponderance of the evidence, that the firefighter's brain cancer is not related to his employment.
C. Record Support for ALJ Findings
1. Environmental Factors Capable of Causing GBM
The employer presented experts in epidemiology, neuro-oncology, and toxicology who testified that medical science has conducted extensive investigation and study of possibly carcinogenic chemicals, the means by which the human body absorbs those chemicals, the pathways by which those chemicals travel to and target human organs, and the effects of those chemicals on various human organs.
a. Thorough and Credible Scientific Investigation
The employer presented extensive testimony and reports regarding widely accepted scientific studies. For example, Dr. Patricia A. Buffler, who holds a doctorate in epidemiology, testified that the evidence from epidemiologic studies of professional firefighters does not support a causal relationship between firefighting and brain cancer.
Based on the evidence, the ALJ could conclude that thorough and well-designed scientific research has looked for a causal connection between the risks to which firefighters are exposed and GBM and found no causal link. Although an ALJ could not find with certainty that no link exists, he or she could properly consider and accept this evidence, and conclude that it makes it more likely that there is no causal connection.
b. Biological Plausibility of Known Exposures
Dr. Buffler testified that there is no known "credible biological mechanism by which chemical exposures associated with firefighting could induce brain cancer in humans." Dr. Denise M. Damek, an oncology physician, testifying as an expert in neuro-oncology, said there is no evidence "that the inhalation or dermal absorption of these chemicals results in any level of carcinogen within brain tissue." She also testified that "there is no evidence that [carcinogens to which firefighters are exposed] target [the] brain."
c. Known Causes of GBM
According to the employer's evidence, extensive studies have shown that the only known factors that increase the risk of GBM are:
• sex (male),
• race (Caucasians are more at risk),
• age (risk increases with age),
• family history, and
• ionizing radiation exposure.
Four of these risk factors do not result from, arise out of, or arise in the course of a firefighter's employment. The only known *459 risk factor for GBM that arises from environmental factors is ionizing radiation exposure.
Dr. Buffler testified:
To date, ionizing radiation is the only known modifiable or environmental risk factor for glioma. Studies of the incidence of primary brain tumors among persons exposed to therapeutic radiation and to moderate doses of radiation from the atomic bombs in Hiroshima and Nagasaki have shown a latency of at least 20 years and longer is associated with these exposures.
(Emphasis added.)
The atomic bomb explosions at Hiroshima and Nagasaki were created by devices that are not likely to be found in Littleton and the surrounding communities. The explosions generated extraordinary levels of ambient ionizing radiation. Considering this evidence in the light most favorable to the employer, the ALJ could properly find that it is more likely that equivalent levels of ambient ionizing radiation did not exist in Littleton and that the firefighter was not exposed to a sufficient level of ambient ionizing radiation to cause his GBM.
As an example of radiation levels high enough to increase risk, Dr. Buffler also referred to "therapeutic radiation directed at the cranium." Dr. Damek explained that ionizing radiation increases the risk of GBM, in particular, when it is "brain irradiation in a therapeutic dose."
By its very name, therapeutic brain irradiation refers to an intentional medical procedure where radiation is aimed directly at the cranium. The testimony confirms this. The ALJ could reasonably infer that therapeutic brain irradiation requires a device designed to produce an extremely high level of focused (not diffused or ambient) ionizing radiation directed at a person's cranium. More likely than not, to create the necessary level of radiation, the device would have to be connected to a power source and turned on. Such devices are not likely to be found outside a hospital or specialized medical clinic. The record contains no evidence or argument that the firefighter was intentionally exposed to therapeutic brain irradiation in the course of his employment. Considering the evidence in the light most favorable to the employer, I conclude that the ALJ could reasonably find that it is more likely that the firefighter's cranium was not accidently exposed to ionizing radiation from such a device.
I also conclude that the ALJ could reasonably find that, more likely than not, devices capable of creating a level of focused ionizing radiation comparable to that of a therapeutic device are not common. However, even speculating that such a device might exist, the evidence supports a finding that it is more likely that the firefighter was not accidently exposed to such a device while it was generating such radiation, let alone that the firefighter's cranium was so exposed.
When reviewing the evidence for sufficiency, we are required to consider the evidence as a whole and in the light most favorable to the prevailing party. The majority opinion's statement about the possibility of the existence of other sources of ionizing radiation of sufficient magnitude is contrary to this requirement. In addition, it requires a standard of proof beyond the preponderance of the evidence.
Based on the evidence in the record, it was reasonable for the ALJ to infer that the firefighter was not exposed to a level of ionizing radiation sufficient to cause his GBM. Thus, there is evidence that it is more likely that the firefighter's GBM did not result from, arise out of, or was sustained in the course of his employment.
2. Known Causes of Other Cancers
The employer presented a report and testimony from Dr. Javier Waksman, a toxicologist. Dr. Waksman testified that "[c]urrent epidemiological and toxicological data does not causally attribute benzene, formaldehyde, arsenic, asbestos, benzo[a]pyrenes, chromium compounds, dioxins, carbonized particulates, wood oils, and soot to the development of glioblastoma multiforme."
Dr. Damek testified that "[n]o known or putative carcinogen has been definitely associated with brain tumor development in either humans or animals." She also testified *460 that "there is no evidence that [carcinogens to which firefighters are exposed] target [the] brain."
The breadth of this statement is significant. Dr. Damek's statement includes all known and putative carcinogens. That is, it includes all substances that science knows can cause any type of cancer, as well as all substances that are suspected, but not proven, to cause any type of cancer. And it says that none of these substances have been definitely associated with brain tumor development in humans or animals. Data that shows a mere association between a substance and a particular cancer is not sufficient to permit an inference of causation. See Boston, 18 Colum. J. Envtl. L. at 237. To determine whether an association is causal, epidemiologists use criteria that treat the statistical association as the starting point of the analysis. Id. Dr. Damek's statement is not that there is no definite proof of causation; it is that there is not even definite proof of an association between known and putative carcinogens and the development of brain tumors. Still further, there is not only no definite association with GBM, there is no definite association with any brain tumors. And, last, not only is there no definite association with brain tumors in humans, but there is not even an association with brain tumors in animals.
This evidence is sufficient to support a finding that it is not likely that known and putative carcinogens cause GBM. Accordingly, the ALJ could properly find that it is more likely that the firefighter's GBM did not result from, did not arise out of, or was not sustained in the course of, exposure to a known or putative carcinogen.
3. Mixtures of Chemicals
Dr. Buffler testified that "[n]one of the chemicals described as associated with firefighting are causally associated with brain cancer." She also testified that there is no basis to conclude that exposure to the mixture of chemicals is causally associated with brain cancer.
D. ALJ's Findings are Supported by the Record
The ALJ's findings plainly state that the employer overcame the presumption. The ALJ's ultimate finding is that the employer proved, by a preponderance of the evidence, that the firefighter's brain cancer is not related to his employment.
I conclude that the evidence is sufficient to support this finding. Specifically, there is sufficient evidence in the record upon which the ALJ could properly find that it is more likely that the only environmental factor capable of causing the firefighter's GBM is therapeutic brain irradiation and that the firefighter was not exposed to such irradiation in his employment. This is a finding of the absence of general causation, and is sufficient to overcome the statutory presumption by a preponderance of the evidence without additional proof of the absence of specific causation.
Nonetheless, there is also sufficient evidence upon which the ALJ could find that it is more likely that known and probable carcinogens, as well as other chemicals to which the firefighter might have been exposed, individually or in mixture, do not cause GBM. In addition, there is sufficient evidence upon which the ALJ could find that it is more likely that there is no credible biological mechanism by which chemicals to which the firefighter was likely to have been exposed could target his brain and cause GBM. This proves the absence of specific causation, which, alone, is also sufficient to overcome the presumption by a preponderance of the evidence.
I have repeatedly noted that we are required to review the evidence as a whole and in the light most favorable to the party that prevailed before the ALJ. I have done so because, in my view, the majority opinion's ultimate conclusion derives from analyses that consider the evidence in the light most damaging to the employer, impermissibly make inferences damaging to the employer, and impermissibly invade the province of the fact finder by focusing on conflicting evidence and resolving the conflicts contrary to the ALJ's findings. This is demonstrated by the majority opinion's identification of conflicting *461 evidence regarding weak associations with brain cancer, increased incidence of brain tumors in experimental animals, and speculation that there might be sources capable of generating levels of ionizing radiation akin to those of an atomic bomb or a therapeutic device.
III. Conclusion
In this case, the resulting-from presumption operated as the General Assembly intended. The employer was burdened with the difficulty and expense of presenting evidence proving that it is more likely that the firefighter's cancer could not have resulted or did not result from his employment. The ALJ found the employer's evidence to be clear, reliable, well-founded, and persuasive. Had the ALJ found that the employer's evidence was not based on well-founded scientific evidence and not reliable, the employer would have failed to sustain its burden and the ALJ would have been required to find in favor of the firefighter.
Under section 8-41-209, a qualifying firefighter who has any cancer of any of the five organs or systems must be afforded the presumption. This case addresses just one type of cancer of one organ of one firefighter. Although the majority concludes that the medical evidence in this case is not sufficient to prove that it is more likely that GBM did not result from this firefighter's employment, firefighters and employers should not assume that the same result would obtain in cases involving other cancers of the brain or cancers of other organs or systems. The evidence of scientific studies, known causes, and biologic plausibility will vary.
I would set aside the Panel's order and remand for reinstatement of the ALJ's June 9, 2009, findings of fact and conclusions of law.

Based on the Smartt and Frohlick Crane Service cases, an alternative phrasing might be "job-related cancers." However, that phrasing is too vague to serve as a useful standard. " 'In the course of employment' generally refers to 'the time, place and circumstances under which the injury occurred.' " Popovich v. Irlando, 811 P.2d 379, 383 (Colo.1991). "The 'course of employment' requirement is satisfied when it is shown that the injury occurred within the time and place limits of the employment relation and during an activity that had some connection with the employee's job-related functions." Id.